**CASE NO. 25-4218**

================================

# IN THE

# 𝕴nited States Court of Appeals

## FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

STEPHEN L. SNYDER,

*Defendant - Appellant.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

————————————

**OPENING BRIEF OF APPELLANT
STEPHEN L. SNYDER**

————————————

C. Justin Brown
Lylian Romero
BROWN LAW
Suite 1000C
233 E. Redwood Street
Baltimore, MD 21202
410-244-5444

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Statement of Subject Matter Jurisdiction and
Basis for Appellate Jurisdiction…………………………………….. ....................1

Statement of the Issue ...........................................................................1

Statement of the Case ...........................................................................1

Statement of Facts ................................................................................2

Summary of the Argument.....................................................................14

Argument................................................................................................15

I.      The District Court Violated Snyder's Right to Due Process and his Right to
        Counsel...................................................................................15

II.     The District Court Erred when it Refused to Instruct the Jury as to Reliance-on-
        Counsel....................................................................................28

III.    The District Court Erred when it Limited the Testimony of a Critical Witness
        Because of a Civil Non-Disclosure Agreement ...........................................36

IV.     The District Court Erred when it Refused to *Voir Dire* the Jury Regarding the
        Court's Contempt Finding and Overnight Incarceration of Snyder ..............43

Conclusion.............................................................................................47

Request for Oral Argument ..................................................................48

Certificate of Compliance with Typeface and Length Limitations .......................49

Certificate of Service .........................................................................50

i

## <u>TABLE OF AUTHORITIES</u>

*Chambers v. Mississippi*,
   410 U.S. 284 (1973) .........................................................................39

*Faretta v. California*,
   422 U.S. 806 (1975) ...................................................................16, 17

*Indiana v. Edwards*,
   554 U.S. 164 (2008) ...........................................................17, 18, 27

*Rock v. Arkansas*,
   483 U.S. 44 (1987) .........................................................................39

*United States v. Bakker*,
   925 F.2d 728 (4th Cir. 1991) ........................................................44

*United States v. Barnes*,
   747 F.2d 246 (4th Cir. 1984) ..................................................44, 47

*United States v. Bassler*,
   651 F.2d 600 (8th Cir. 1981) ........................................................44

*United States v. Frazier-El*,
   204 F.3d 553 (4th Cir. 2000) .........................................16, 17, 18, 27

*United States v. Gorski*,
   36 F. Supp. 3d 256 (D. Mass 2014) ...........................................14, 29

*United States v. Gray*,
   47 F.3d 1359 (4th Cir. 1995) .............................................14, 29, 31

*United States v. Lewis*,
   612 Fed. Appx. 172 (4th Cir. 2015) .............................................17

*United States v. Lighty*,
   616 F.3d 321 (4th Cir. 2010) ....................................................28, 30

*United States v. Powell*,
   680 F.3d 350 (4th Cir. 2012) .............................................28, 29, 31

*United States v. Schmidt*,
   935 F.2 1440 (4th Cir. 1991) .........................................................29

*United States v. Singleton*,
    107 F.3d 1091 (4th Cir. 1997) ........................................................18

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982) ........................................................................39

*Washington v. Boughton*,
    884 F.3d 692 (7th Cir. 2018) ..........................................................17

*Washington v. Texas*,
    388 U.S. 14 (1967) ..........................................................................39

**Statutes**

18 U.S.C. § 1951 ...................................................................................1

18 U.S.C. § 1952 ...................................................................................1

18 U.S.C. § 3231 ...................................................................................1

28 U.S.C. § 1291 ...................................................................................1

**Constitution**

U.S. Const. amend. V .....................................................................15, 36

U.S. Const. amend. VI.......................................................15, 16, 36, 38, 39

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The lower court held jurisdiction over this case pursuant to 18 U.S.C. §3231.

Stephen Snyder appeals from the final judgment of conviction entered in the

United States District Court for the District of Maryland on April 3, 2025. JA2790.

A timely notice of appeal was filed on April 15, 2025. JA2796. This Court has

jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Snyder was denied his right to due process and his right to counsel.

2. Whether the district court erred in refusing to instruct the jury, over Snyder's objection, on advice of counsel.

3. Whether the district court erred when it limited Michele Sanders' testimony based on her non-disclosure agreement in a civil case.

4. Whether the district court erred when it refused to voir dire the jury regarding their knowledge of Snyder being incarcerated for contempt of court.

## STATEMENT OF THE CASE

On October 5, 2020, in the United States District Court for the District of

Maryland, Appellant Stephen L. Snyder was charged with one count of attempted

extortion, in violation of 18 U.S.C. §§ 1951 and 2 (Count One); and seven counts

of violation of the Travel Act, in violation of 18 U.S.C. §§ 1952(a)(3) and (b)(2)

(Counts Two through Eight). JA030-JA047.

1

The district court held pretrial hearings on Snyder's motions to compel production of *Brady* materials (May 26, 2022) and to dismiss the indictment (July 26, 2024), both of which were denied. On December 8, 2023, the district court held an attorney inquiry hearing and allowed Snyder's counsel, Arnold Weiner, to withdraw from the case. Later that day, during a *Faretta* hearing without counsel, Snyder waived his right to counsel. Gerald Ruter was later appointed as standby counsel. Pretrial motions and conferences were held on October 28th and November 4, 2024, and trial began before the Honorable Deborah L. Boardman on November 12, 2024.

On November 22, 2024, following a nine-day trial, the jury found Snyder guilty on all counts.

On April 2, 2025, the lower court imposed a sentence of three years' probation on all counts, with the first six months to be served on home confinement. JA2790. Snyder filed a timely notice of appeal on April 15, 2025. JA2796. This appeal follows.

## STATEMENT OF FACTS

In November 2024, while suffering from a combination of Parkinson's disease and dementia, Stephen Snyder represented himself against federal charges of attempted extortion and Travel Act violations. His symptoms – disordered thinking, short-term memory loss, and cognitive impairment – permeated the trial,

2

making it impossible for him to remember (and follow) the court's rulings, follow the rules of procedure and evidence, properly examine witnesses, and maintain the decorum of the court. The trial judge, who believed that Snyder was intentionally violating her orders and manipulating the trial, constantly chastised, interrupted, and sanctioned Snyder, even finding him in criminal contempt and jailing him on the night before the Jury began its deliberations. The result was a fundamentally unfair trial, at the end of which the Jury convicted Snyder on all counts.

### a. Snyder's Malpractice Claims

For 50 years, Stephen Snyder was a prominent Maryland malpractice lawyer. In 2017 and 2018, Snyder represented two former patients of the University of Maryland Medical System ("UMMS") who had suffered catastrophic injuries, and in one instance, an agonizing death, as a result of grossly inappropriate organ transplants. Latrice Bennett became paralyzed following a pancreas transplant, while Jeffrey Sanders ultimately died following an unsuccessful kidney transplant.[1] Both claims settled for substantial amounts: Bennett's for $8.5 Million; and Sanders' for $5 million.

---

[1] Snyder was initially hired by Jeffrey Sanders, who suffered devastating damages from the kidney transplant, including necrosis in his fingers and an amputation. However, Jeffrey died shortly thereafter, and Snyder ultimately represented his estate and his widow, Michele Sanders, in her wrongful death claim against UMMS. To avoid confusion, Michele Sanders will be referred to as Sanders, and her husband will be referred to as Jeffrey.

3

While Bennett's case turned out to be a routine malpractice settlement, Sanders' case was something new for Snyder. At the outset of his representation, Michele Sanders (Jeffrey Sanders' widow) told Snyder she would only settle the case with UMMS if, among other demands, UMMS hired Snyder as a consultant, so that what happened to her husband "would never, ever, ever happen to anyone again." JA2159. Sanders had researched the transplant department and believed it suffered from systemic failures that led to her husband's fatal transplant. She wanted Snyder to work as a consultant so that he could oversee reforms to the transplant program, while also ensuring that the doctors who had been involved in her husband's care were not hired back by the hospital. *See* JA2159, JA2162.

In investigation of Sanders' claim, Snyder hired Dr. Antonio DiCarlo, an organ transplant specialist, as an expert to review both the Sanders and Bennett cases. JA2315-2316; JA2320-2321. DiCarlo opined that the kidney that had been transplanted into Jeffrey was a high-risk kidney, that it had "multiple concerning pathological findings," JA2367, and that it should not have been offered to Jeffrey. JA2324-2325, JA 2345, JA2367-2368 ("Placing a poor kidney with an extremely high likelihood of failure into a patient with multiple comorbidities … is predictive of a poor outcome"). He also stated that for a kidney with a Kidney Donor Profile Index ("KDPI") of 97 (as was transplanted into Jeffrey), this meant that 97 percent of kidneys would "work longer or have better function than that kidney." JA2323.

4

Ultimately, DiCarlo opined that "[p]oor judgment was exercised by this program in selecting this kidney and transplanting it in this patient." JA2369.

Snyder also hired Jesse Schould, a transplant surgery professor and statistician, to review and compare UMMS's performance against national transplant program statistics. JA2209-2212, JA2220-2221. Schould informed Snyder that, as compared to all other transplant centers, UMMS had: (1) a "significantly slower" transplant rate (JA2238); (2) a higher-than-expected "waitlist mortality rate" (38-percent-higher rate of death) (JA2239); (3) a lower-than-expected overall kidney acceptance ratio, but a significantly higher acceptance rate of high-risk kidneys ("60 percent more likely to accept high-risk offers") (JA2240); and (4) a 57 percent higher one-year graft failure rate (meaning the rate at which either the kidney fails or the patient dies within one year of transplant) (JA2242-2243).

Snyder had never pursued a consultancy before, so he also sought guidance from several attorneys, including prominent Baltimore ethics attorney Andrew Graham, to determine whether and how he could ethically do so. The lawyers advised him how to properly pursue the consultancy, and they gave him talking points for his meeting with UMMS and sample consultancy agreements to use in his discussions. *See* JA1342-1343; JA1349-1350; JA1428-1430; *see also*, JA2881, JA2899.

Around this same time, Snyder also met Dr. Stephen Bartlett, a transplant surgeon and the Executive Vice-President of UMMS. Bartlett had previously operated on Snyder's client, Bennett, and UMMS attorneys asked him to participate in Bennett's settlement conference to help persuade her to settle her claims. JA1100-1101. Snyder spoke privately with Bartlett at this conference and alerted him to other potential malpractice cases. JA1101-1102. Bartlett agreed that Snyder "seemed to have a lot of information about cases," and both he and UMMS lawyers thought it would be a good idea for Bartlett to meet with Snyder and "find out what he really knew." JA1104. Bartlett even believed, based on the information Snyder had, that Snyder was receiving "inside information" from someone within the transplant department. JA1173. In a text message sent to Snyder in April 2018 – *prior* to any of Snyder's meetings with UMMS regarding the Sanders case – Bartlett said, "Steve, Sue and I just spoke. I explained to her that we're in jeopardy for fraud and punitive damages. She understands. The ball is in your court." JA1109.

### b. *Snyder's Meetings with UMMS*

Based on Sanders' settlement demands, and armed with the information he received from his two experts, his lawyers, and Bartlett, Snyder met with UMMS on April 30, 2018, June 22, 2018, and August 23, 2018. He offered to resolve the matter for a $5 million settlement with Sanders and a ten-year, $25 million

consulting agreement with him, pursuant to which Snyder would be disqualified from asserting further claims against UMMS. If UMMS refused the proposal, Snyder stated, he would file Sanders' lawsuit for negligence and fraud, and with attendant publicity, he would advertise for additional transplant cases in commercials that would refer to the circumstances of Sanders' case and the dysfunctional operation of the UMMS transplant department. *See*, *e.g.*, JA091; JA1789-1790. Snyder told UMMS that this would be financially devastating to the hospital.

Roughly two months after Snyder's June 22nd meeting with UMMS lawyers, UMMS complained to the U.S. Attorney's Office that it was the victim of an attempted extortion. The federal government began an investigation that included recorded phone calls and one recorded meeting. At the August 23, 2018, meeting, which the government surreptitiously recorded, UMMS representatives suggested to Snyder that his proposal might be extortionate. JA108; JA975-976. Snyder explained that he had hired Graham "to make sure" that his consultancy proposal was proper. JA109; *see also*, JA1301-1302, JA1460. He rejected the idea that his proposal was extortionate, explaining that every malpractice claim involves the potential for a lawsuit and attendant publicity, and that defendants settle to avoid those outcomes. JA109. Snyder later added that he would not enter into any arrangement with UMMS unless UMMS and Snyder were both satisfied that the

7

proposed arrangement could be accomplished "ethically, morally, comfortably... ." JA223.

Although UMMS never had any intention of agreeing to a consultancy, Snyder believed that UMMS was negotiating with him in earnest, and he tried to assuage every concern they raised regarding the consultancy. He even insisted that the UMMS lawyers meet with Graham so that they could feel comfortable with the proposal. Snyder repeatedly emphasized that he would not go forward with his proposal unless he and UMMS, guided by Graham, were satisfied that they could "do it the right way." JA118. Snyder added that, "if it can't be done, I don't want to do it." JA121, JA129. Snyder acknowledged that it was a question of, "can it be done, and can it be done appropriately," JA210, and that, "[w]e may or may not be able to figure it out." JA221. Snyder concluded the meeting by declaring yet again that, "if it can't be done then it can't be done," and "that's just the bottom line." JA230.

Snyder continued to push for UMMS lawyers to meet and speak directly with Graham to determine the propriety of Snyder's proposal. In an August 24th recorded telephone call, for example, Snyder told Sue Kinter (one of the UMMS attorneys) that he had spoken to Graham and that, "[a]ll four of us should meet" (JA275); that, "[y]ou want to do it the right way and, believe me, so do I. So do I" (JA276); and that, "I wouldn't want to do anything that jeopardizes my career at

8

this stage of my life either." JA277; *see also*, JA284 (Graham "thinks we all should meet ... because he wants you to be comfortable with the process"); JA295-296 (Snyder suggested to Kinter that she should hear from Graham "firsthand").

Despite Snyder's prodding, UMMS hesitated to schedule a meeting with Graham, but eventually agreed to an in-person meeting that would take place on September 6th. *See* JA1311. But on September 5th, at the direction of the U.S. Attorney's Office, Kinter told Snyder she did not need to hear from Graham. JA1311; JA050; JA055. The next morning, Kinter canceled the meeting altogether. JA056. Kinter later admitted to a State investigator that the U.S. Attorney's Office had directed her to refuse to meet with Graham because they "were uncomfortable with Mr. Graham attending the meeting because it would be recorded."[2] JA050.

Shortly thereafter, Snyder settled Sanders' case for $5 million. JA979. Around the same time, the U.S. Attorney's Office terminated the investigation and declined to prosecute Snyder, concluding that "there was no criminal intent by Stephen Snyder to extort UMMS because Snyder was willing to include Andy Graham and members of the UMMS Board."[3] JA834. UMMS then filed a

---

[2] At trial, Kinter denied making this statement, and the trial court did not permit Snyder to refresh her recollection or attempt to impeach her with her prior statement to the investigator. *See* JA1586-1588, JA1665; JA1675-1678.

[3] For more than three years before his trial, Snyder sought to compel the Government's disclosure of this memo, as well as any evidence supporting the Government's 2018 decision not to prosecute, but the Government refused to explicitly acknowledge its existence, and Snyder's requests were denied. *See*

complaint against Snyder with the Maryland Attorney Grievance Commission ("AGC"). After an extensive investigation, the AGC also declined to charge Snyder with a criminal act under the Maryland Rules of Professional Conduct. JA662.

### c. Criminal Charges and Trial.

Two years later, however, on October 5, 2020, and without any advance warning, the government indicted Snyder on charges of attempted extortion in connection with his 2018 communications with UMMS. It took another four years – more than six years after the alleged conduct – for the case to go to trial. Snyder, by then 77 years old and mentally infirm, represented himself.

Prior to trial, after having spent at least $2.5 million on attorneys' fees for representation in this case, Snyder's attorney, Arnold Weiner, withdrew from the case, over Snyder's objection. JA2975-2976, JA2978, 298168). At a subsequent *Faretta* hearing, Snyder waived his right to counsel – although he seemed to vacillate between wanting an attorney and wanting to represent himself. *See*, *e.g.*, JA499, JA507-508, JA509, JA511-514, JA516-519, JA522. Later, during a pretrial hearing, Snyder told the trial judge about a myriad of health issues, including that he was receiving 24-hour custodial long-term care, that he had gait issues and fears

---

JA376-496. It was not until days before his trial would begin that the Government allowed Snyder to inspect – but not copy – the memo. JA704-705, JA709. By then, all supporting evidence had been destroyed. JA709-710.

of falling (JA3061-3063), that he had fallen in the bathroom, hit his head, and was unable to get up for 30-to-40 minutes (JA3105), and that he was seeing a neurologist and suffering from short-term memory loss (JA3105-3106). The court did not inquire further into these matters.

At a subsequent pretrial conference, Snyder informed the trial judge that his doctors were "investigating whether [he had] Parkinson's disease." JA674. Again, the court did not inquire further into this information. The court was, however, concerned enough with Snyder's performance during these hearings that she ordered another attorney inquiry hearing. On October 30, 2024, despite citing the concerning behaviors Snyder had exhibited (but making no mention of the potential Parkinson's diagnosis), the court again permitted Snyder to waive his right to counsel. *See* JA3217-JA3251. Snyder's trial began approximately two weeks later.

At trial, Snyder's defense was that he rightfully pursued a consultancy because it was one of his client's settlement demands; that he had advice of counsel during his dealings with UMMS; and that any alleged threats of economic harm were made in the context of a prospective lawsuit, which in turn was based

on Snyder's legitimate belief regarding widespread fraud and gross negligence within the transplant department.[4]

During their testimony, UMMS representatives admitted to malpractice in both the Bennett and Sanders cases, but they denied systemic fraud within the transplant department. *See*, JA1629, JA1635. Sanders testified on Snyder's behalf and confirmed that the consultancy was her idea, and that she demanded it as a term of any settlement with UMMS. However, due to a confidentiality provision in her settlement with UMMS, the trial court prohibited Sanders from testifying about most aspects of her case against UMMS, leaving Snyder unable to introduce evidence critical to his defense. And despite testimony from three of Snyders' attorneys confirming that he had consulted with them about his proposals to UMMS, the trial court refused Snyder's request for an advice-of-counsel instruction, thereby cutting Snyder's defense off at the knees.

---

[4] The Government argued, among other things, that Snyder's proposed consultancy was a sham. It made much ado about a claim, by one of UMMS's lawyers, that Snyder had said he could be a "janitor" for UMMS under the consultancy. *See*, *e.g.*, JA1838; JA2441. But first, this was disputed, as other witnesses' contemporaneous notes of the same meeting did not include such a reference. *See* JA1811-1812, JA1314-1315. Second, this was one comment among numerous discussions about what Snyder could do for the hospital as a consultant. Those were ongoing, and the proposed agreement was still undefined; but evidence at trial established that (1) the consultancy would conflict Snyder out of cases against UMMS, and (2) Snyder was offering to do whatever UMMS needed or wanted him to do as a consultant, including advising them on malpractice claims. *See*, *e.g.*, JA1789-1790.

12

On November 22, 2024, Snyder was found guilty of all counts. Less than a month later, on December 17, 2024, Snyder was diagnosed with "Lewy Body Parkinsonism," a form of Parkinson's disease combined with a form of dementia. JA3269, JA3294. His medical records, submitted to the court in advance of sentencing, reflected that Snyder's cognitive decline had started years earlier (JA3271, JA3389), and that many of the behaviors Snyder exhibited both prior to and during his trial – disorganization, repetitiveness, mental rigidity, getting off topic easily, and an inability to get back on track – were manifestations of his cognitive issues. *See* JA3294.

On April 2, 2025, at his sentencing hearing, the trial court made a point of noting that "none of these [medical] records were provided to the Court before [Snyder] decided to go pro se or before trial." JA3476. Although the court expressed that Snyder seemed to be acting intentionally during the trial, this statement seemed to acknowledge, at least implicitly, that perhaps the trial, or the decision to permit Snyder to proceed *pro se*, would have been handled differently had the court been aware of the extent of Snyder's cognitive decline. Due to his extensive health issues, Snyder was ultimately sentenced to three years of probation. JA2776-2777. Additional facts will be developed below as necessary.

## SUMMARY OF THE ARGUMENT

Snyder's trial was fundamentally unfair for three reasons. First, Snyder – who was suffering from Parkinson's and dementia – lacked the mental capacity to represent himself, and the trial court violated both his right to counsel and his right to due process in permitting him to proceed *pro se*, despite being on notice of his mental infirmities. Snyder's cognitive issues caused him to repeatedly violate the court's orders, conduct improper witness examinations, and bicker with the court. This led to increasingly excessive sanctions by the court, including frequent interruptions, public admonishments, time-limitations on examinations, *sua sponte* objections, and ultimately, imprisonment for contempt – all of which caused substantial harm and undue prejudice to Snyder's defense.

Second, the trial court erroneously denied Snyder's request for an advice-of-counsel instruction, eviscerating Snyder's sole defense. Snyder was entitled to this instruction as long as he established an "evidentiary foundation" to support his theory – which he did. *See United States v. Gray*, 47 F.3d 1359, 1369 (4th Cir. 1995); *United States v. Gorski*, 36 F. Supp. 3d 256, 267 (D. Mass 2014). Three lawyers testified that Snyder had consulted with them about his malpractice case against UMMS and the propriety of a consultancy agreement. The possibility of extortion – and how to avoid it – was specifically discussed with two of those lawyers. This was sufficient to generate a jury question as to whether Snyder

14

established the "reliance on counsel" defense. But, applying the wrong standard, the trial court refused the instruction because it found that Snyder failed to establish this defense – a question that the Jury should have resolved. This was an abuse of discretion and requires reversal.

Finally, the trial court violated Snyder's constitutional right to present his defense when it prevented one of his most important witnesses, Michele Sanders, from testifying about her settlement with UMMS because of a non-disclosure agreement included in her settlement. Sanders was a critical witness not only because the consultancy proposal was *her* idea, but also because her testimony would have established wrongdoing by UMMS. This testimony, in turn, would have shown that Snyder was not acting wrongfully in pursuing the consultancy nor in warning the hospital of the damages it could be exposed to should the case proceed to litigation. But the trial court erroneously gave greater weight to the non-disclosure agreement than to Snyder's constitutional rights, violating his Sixth Amendment right to compulsory process and Fifth Amendment right to due process.

## **ARGUMENT**

### I.  **THE DISTRICT COURT VIOLATED SNYDER'S RIGHT TO DUE PROCESS AND HIS RIGHT TO COUNSEL.**

The district court erred in allowing Snyder to proceed *pro se*, or alternatively, in failing to revoke his *pro se* status despite having knowledge of his

cognitive impairment, short-term memory loss, and potential Parkinson's diagnosis – all of which made it impossible for Snyder to conduct his defense. As a result of this error, Snyder often found himself pitted against not only the Government, but also the trial court, which erroneously believed that Snyder was intentionally seeking to disrupt and manipulate the trial. Throughout the entire trial, the court repeatedly chastised Snyder in the Jury's presence, sanctioned him, limited his examination of witnesses, and unnecessarily truncated his presentation. Combined, these actions by the court made it impossible for Snyder to have a fair trial, violating his constitutional right to due process and his right to counsel. The result was a trial that was fundamentally unfair, warranting reversal.

The Sixth Amendment guarantees not only the right to counsel, but also the right to self-representation. *Faretta v. California*, 422 U.S. 806, 821 (1975). As the Supreme Court held in *Faretta*, a defendant may represent himself, as long as he knowingly and intelligently waives his right to counsel. *Id*. at 835.

The right of self-representation, however, is not absolute. *See id*. at 834, n.46 (noting that the trial judge may terminate self-representation under certain circumstances); *United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000) ("At bottom, the *Faretta* right to self-representation is not absolute"). A defendant who competently waives his right to counsel might still lack the mental capacity to represent himself. Thus, even where a district court has found a knowing and

voluntary waiver of counsel, the court may – and indeed, should – terminate self-representation if it becomes clear that a defendant, whether by reason of deliberate manipulation or mental infirmity, is unable to represent himself without causing disruption or undermining the integrity of the proceedings. *See*, *e.g.*, *Faretta*, 422 U.S. at 834, n.46 ("the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct" or "abuse[s] the dignity of the courtroom"); *Indiana v. Edwards*, 554 U.S. 164, 176 (2008) (a trial court may limit a defendant's right to self-representation if the defendant, though competent to stand trial, lacks the mental capacity to conduct his defense without assistance of counsel); *Frazier-El*, 204 F.3d at 560 (permitting denial of the right to self-representation to avoid delay, disruption, or manipulation of the trial process); *see also*, *United States v. Lewis*, 612 Fed. Appx. 172, 176 (4th Cir. 2015) (affirming revocation of a defendant's *pro se* status when it became clear, among other things, that the defendant's "disordered thinking" prevented him from managing the large amount of documentary evidence); *Washington v. Boughton*, 884 F.3d 692 (7th Cir. 2018) (a trial court may terminate self-representation if it becomes clear that the defendant is mentally unfit to conduct trial proceedings, or if he deliberately disrupts the proceedings).

The court's right to insist that a defendant be represented by counsel – even against the defendant's wishes – is rooted in the right to due process. As this Court

has recognized, "[r]epresentation by counsel does not merely tend to ensure justice for the individual criminal defendant, it marks the process as fair and legitimate, sustaining public confidence in the system and in the rule of law." *Frazier-El*, 204 F.3d at 558 (citing *United States v. Singleton*, 107 F.3d 1091, 1102 (4th Cir. 1997)). *See also*, *Edwards*, 554 U.S. at 176-77 (noting that, permitting self-representation by a defendant who lacks the capacity "undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial"); *id*. at 176 ("a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel").

In the instant case, the district court was on notice prior to trial that Snyder lacked the capacity to represent himself, and this should have prompted the court either to deny Snyder's request to represent himself, or to revoke his self-represented status once it became clear that his mental infirmities would interfere with his ability to conduct his defense. First, Snyder *told* the court of his neurological issues prior to trial; and second, even though the court did not make further inquiry into Snyder's cognitive problems, they became apparent through his conduct both prior to and during the trial. This should have prompted the court to take decisive action to protect Snyder's right to a fair trial.

18

Snyder waived his right to counsel on December 8, 2023. JA497. However, his first *pro se* appearance was not until nearly eight months later, at the July 26, 2024, hearing on his motion to dismiss. By then, his cognitive issues were readily apparent. During that hearing, Snyder (who was then 77 years old) informed the court that his health had declined significantly since his indictment four years earlier. JA3061, JA3104). Among other things, he told the court he had recently been awarded long-term care benefits, that he had spoken with a psychiatrist, and that he had two neurologists – one to deal with his "problems" in general, and another to deal with his gait issues. JA3062. He also told the court he had spent the last two years sitting in front of his television watching Harry Potter all day. JA3062.

When asked why he was sharing this information with the court, Snyder said, "You're dealing with - - again, I don't want to convince you that I can't do this because I was able to get through this today. But I am a scarred - - and I'm not the kind of guy I used to be." JA3063.

Then, during a break in the hearing, Snyder fell in the restroom, injuring his head. JA3105. He informed the court of the fall, explaining that he was unable to get up for 30-to-40 minutes, until his standby counsel found and helped him. JA3105. Snyder then shared that he had recently failed a memory test administered by his neurologist. JA3106. Although Snyder did not believe he had any memory

deficiencies, both his family and his "co-counsel" did – which the memory testing confirmed.[5] JA3106.

The court eventually asked Snyder if he wanted the court to appoint counsel, but Snyder declined; he felt he was functioning "fairly well," and he wanted to be counsel, but he wanted the court to know he would be "doing it with all these issues." JA3106.

Three months later, during the pretrial conference on October 28, 2024, Snyder informed the court that he had another "bad fall" the night before. JA655. He said he was having bad imbalance problems and was worried. Throughout this hearing, Snyder's cognitive deficiencies were again glaringly apparent. As Snyder was making an argument, the court briefly interrupted him, and Snyder "lost [his] train of thought." JA656. Snyder also expressed "great difficulty reading through all these documents" the Government had recently produced. JA660. Later, the court asked Snyder about the relevance of evidence he was seeking to introduce, JA663, and, after a rambling response, Snyder said, "I don't know if I'm answering your question or not, but I'm sure trying to." JA665. At one point, Snyder even informed the court that his doctors were investigating whether he had Parkinson's disease. JA673-674. The court did not make any inquiry into the potential Parkinson's diagnosis.

---

[5] Snyder did not have co-counsel. He was referring to his standby counsel, Gerald Ruter.

The remainder of the proceeding is rife with demonstrations of Snyder's inability to represent himself without the assistance of counsel:

- Snyder was unaware, two weeks before trial, of an expert witness his team had previously disclosed to the Government. The court remarked, "that's concerning to me, to be honest with you," to which Snyder responded, "I'm so worn out." JA684.

- Snyder, mid-argument, lost his train of thought, stating, "it really is relevant because -- I don't want to be -- sometimes I'm having trouble with short-term memory. What did I say before?" JA701. Shortly thereafter, when the court deferred its ruling, Snyder said, "I don't even know what I asked you to rule but …" JA702.

- Seeking dismissal of the case, Snyder suggested that the court could simply dismiss his case on the grounds that he was not well, indicating a fundamental misunderstanding of criminal law and procedure. *See* JA714 (suggesting that the court could grant his motion to dismiss on grounds that it would not "let this man of 53 years with a good record force himself to trial when he's not well").

- While reviewing objections to the jury instructions, Snyder said, "I thought I did [have an objection], but Mr. Ruter is telling me it's in the voir dire and not in the jury instructions." JA716. The court

reminded Snyder that he's the attorney, not Ruter; and Snyder

ultimately said, "I'll pass for the moment." JA717. When the court

asked Snyder what he meant, Snyder said, "I don't know." JA717.

The trial court was obviously concerned about Snyder's ability to represent

himself, and she referred him to a magistrate judge for another attorney inquiry

hearing. *See* JA3217. When confronted with the laundry list of reasons why he

should not represent himself, however, Snyder insisted that the court was making it

sound worse than it was. But when Snyder returned for another pretrial conference,

it remained clear that it *was* as bad as it seemed.

For example, the court admonished Snyder and demanded to know why he

had missed the court's expert disclosure deadline, which had been established the

week before. The court asked, "I ordered you to do that by Friday, and what's your

excuse?" JA767. Snyder started, "My health is not good and I can only last for a

certain amount of time," but the court pressed: "Why wasn't it produced on

Friday?" JA768. Snyder responded, "You know, to be candid, Judge, I don't

remember what our last hearing was about." JA768.

Later in the same hearing, when asking Snyder whether he understood the

local rules on admission of exhibits, Snyder could not articulate his understanding,

stating, "These are the kind of things that I rely on Mr. Ruter to help me with."

JA772. These statements by Snyder demonstrated that he would not be able to abide by the court's orders or put on his case without assistance.

These issues persisted throughout trial. Snyder was disorganized and stumbled through his presentation. For example, he had trouble finding exhibits, and more than once had to rely on the Government to find or display them for him. *See*, *e.g.*, JA985-987; JA1227-1228; JA1652-1653; JA1702-1704). He had trouble getting exhibits into evidence, and at times even forgot to seek admission of critical evidence. *See*, *e.g.*, JA1135-1137; JA1144-1145; JA2293-2296). With every witness, Snyder elicited repetitive testimony because he could not remember what he had already asked. He also exhibited significant difficulty examining witnesses: he could not properly lay a foundation for his questions; he repeatedly asked complex and confusing questions; he questioned witnesses about things that were either not relevant or not within the witnesses' personal knowledge; and he often inserted facts not in evidence into his questions. He also appeared to "violate" the court's evidentiary rulings repeatedly, because he could not remember them. *See*, *e.g.*, JA1165-1167; JA1312-1313; JA1693; JA1695.

From the very first day of trial, Snyder's inability to conduct the trial led to interruptions and admonishments by the trial court, as well as threats to revoke Snyder's *pro se* status. For example, during a break in his cross-examination of the Government's first witness, the court admonished Snyder for his form of

questioning and instructed him to ask proper questions that were within the witness's personal knowledge. JA1019. The judge also warned Snyder that she would continue to interrupt him, even in front of the jury, if he persisted in his improper questioning. JA1019. The Government called Snyder's cross a "circus" and accused him of intentional misconduct. JA1021.

During another break in the same cross-examination, the court again admonished Snyder for violating one of its pretrial rulings. JA1036. The court also threatened to revoke Snyder's *pro se* status if it found that Snyder was "deliberately disrupting the trial." JA1036. These admonishments and interruptions continued throughout the remainder of the first day of testimony. *See* JA1052-1053; JA1065. At the end of the first day, the court admonished Snyder for his unpreparedness, his lack of focus, and his failure to ask proper questions. JA1071. The court again warned Snyder that it would continue to interrupt him if he is not more focused, and that it could revoke his *pro se* status. JA1071.

The next day, the proceedings began with the court admonishing Snyder for his performance the day before. The court questioned whether Snyder was acting deliberately and said it was doubting his ability to follow the rules of evidence and properly examine witnesses. JA1080-1085. The court again reminded Snyder of its ability to revoke his *pro se* status. JA1087. The court's admonishments continued throughout the second day of testimony. *See*, *e.g.*, JA1136; JA1144-1145; JA1160-

1161; JA1193-1194; JA1273; JA1280-1281; JA1312-1313. Despite the court's repeated interruptions and admonishments, Snyder could not seem to ask proper questions or adhere to the court's rulings.

Snyder's conduct also drew the ire of the Government, which repeatedly objected to his form of questioning. Indeed, on the third day of witness testimony, the judge began the proceedings by again admonishing Snyder, and informing him that she had sustained more than 100 Government objections the day before. JA1365-1368. And every time the Government (or even the court, acting *sua sponte*) objected to his questions, Snyder was thrown off and had trouble getting back on track with his line of questioning. Oftentimes, he could not understand why a particular line or form of questioning was improper, or why the Government was objecting – even after the court explained it to him. Thus, he would just ask the same question over and over, leading to more objections and admonishments – all in front of the Jury. And although Snyder had made the court aware of his cognitive issues, the trial judge believed that Snyder was intentionally disrupting the proceedings and disregarding her orders. *See* JA1160; JA1193; JA1365-1367; JA1371.

The court's belief that Snyder was acting intentionally had a pernicious effect on the trial. The court grew impatient with Snyder and imposed increasingly excessive sanctions on him, cutting him off during witness examination, or limiting

his opportunity for redirect. Over the course of the trial, the court sustained hundreds of objections (at times improperly); imposed time limitations on Snyder's direct and cross-examinations; and often bickered with him or admonished him in the presence of the jury. By the third day of testimony, the court found that Snyder's conduct was prejudicial to the Government and gave a curative instruction to the jury, over Snyder's objection, that "Mr. Snyder's questions and statements … are not evidence." JA1374. The court even got angry with Snyder when it felt that he was intentionally disrespecting the court, when in reality, he could not remember the court's rulings and was seeking clarification. JA1313.

Ultimately, the judge's erroneous belief that Snyder was acting intentionally culminated in a finding of criminal contempt, for which she jailed Snyder for one night (on the eve of deliberations). JA2520.

Under these circumstances, it was impossible for Snyder to get a fair trial. Not only was his ability to put on his defense severely impaired; but also, his interactions with the court, and with witnesses, made him appear intentionally argumentative, disruptive, and manipulative in front of the Jury. These impressions were particularly prejudicial in a case where the Jury had to decide whether Snyder had extortionate intent in his dealings with UMMS.

In reality, Snyder's disordered thinking, cognitive impairment, and short-term memory loss made it impossible for him to remember and adhere to the

court's rulings, and to manage the requirements of self-representation. *See Indiana v. Edwards*, 554 U.S. 164, 176 (2008) (recognizing that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant") (citing Brief for APA et al. as *Amici Curiae* 26).

Although it seems that the district court was trying to protect Snyder's right to self-representation, it was obvious that he was not up to the task. Under these circumstances, appointing counsel was the only way to ensure the fairness and integrity of the proceedings, and the court should have revoked Snyder's *pro se* status. This Court has recognized that, when the right to self-representation and the right to counsel are in conflict, the right to counsel is preeminent, "because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right to self-representation." *United States v. Frazier-El*, 204 F.3d 553, 559 (2000). Further, "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id*. This was one of those times. The court's failure to revoke Snyder's *pro se* status and appoint counsel violated both his right to counsel and his right to a fair trial.

27

## II.    THE DISTRICT COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY AS TO RELIANCE ON COUNSEL.

The district court abused its discretion when it refused, over Snyder's objection, to give the jury an advice-of-counsel instruction, which was the basis of Snyder's defense at trial. The court erroneously found that there was no evidentiary basis for the instruction, despite ample evidence of the fact that Snyder both consulted with counsel and directly involved counsel in his discussions with UMMS. This would have been a full defense to the allegations against Snyder: if the Jury believed that Snyder relied or acted upon advice from his attorney in his dealings with UMMS, the Jury would have had to find Snyder not guilty. Whether the evidence satisfied the elements of an advice-of-counsel defense should have been left to the Jury, and the district court erred in refusing to give this instruction.

The refusal to give a requested instruction constitutes reversible error if "the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). The district court's decision is reviewed for abuse of discretion. *Id*.

A jury may acquit a defendant if it finds that he relied on the advice of his attorney, thereby refuting evidence that he actually intended to commit the charged offense. *See United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012) (internal

citations and quotation marks omitted). The elements of an advice-of-counsel

defense are (1) full disclosure of all pertinent facts to an attorney, and (2) good

faith reliance on the attorney's advice. *Id*.; *see also*, *United States v. Schmidt*, 935

F.2 1440, 1449 (4th Cir. 1991). A defendant is entitled to the instruction as long as

"the instruction is both an accurate statement of the law and has an evidentiary

foundation." *Powell*, 680 F.3d at 356 (internal citations and quotation marks

omitted). An evidentiary foundation exists "as long as evidence presented by any

party at trial supports the theory or defense in the instruction." *United States v.

Gray*, 47 F.3d 1359, 1369 (4th Cir. 1995). In other words, the defendant need not

affirmatively prove the defense to get the instruction; he need only "establish

a *prima facie* defense of advice of counsel." *United States v. Gorski*, 36 F. Supp.

3d 256, 267 (D. Mass 2014).

Here, Snyder was entitled to the reliance-on-counsel instruction, which he

requested during the charge conference, JA2283, and the district court abused its

discretion by refusing to give it. The model instruction reads:

> You have heard evidence that the defendant received advice
> from a lawyer and you may consider that evidence in
> deciding whether the defendant acted willfully and with
> knowledge.
>
> The mere fact that the defendant may have received legal
> advice does not, in itself, necessarily constitute a complete
> defense. Instead, you must ask yourselves whether the
> defendant honestly and in good faith sought the advice of a
> competent lawyer as to what he may lawfully do; whether he

29

fully and honestly laid all the facts before his lawyer; and
whether in good faith he honestly followed such advice,
relying on it and believing it to be correct. In short you
should consider whether, in seeking and obtaining advice
from a lawyer, the defendant intended that his acts shall be
lawful. If he did so, it is the law that a defendant cannot be
convicted of a crime that involves willful and unlawful
intent, even if such advice were an inaccurate construction of
the law.

On the other hand, no man can willfully and knowingly
violate the law and excuse himself from the consequences of
his conduct by pleading that he followed the advice of his
lawyer.

Whether the defendant acted in good faith for the purpose of
seeking guidance as to the specific acts in this case, and
whether he made a full and complete report to his lawyer,
and whether he acted substantially in accordance with the
advice received, are questions for you to determine.

Modern Federal Jury Instructions—Criminal (MFJI-C), ¶ 8.04 (Matthew Bender).

The model instruction was a correct statement of the law; it was not

substantially covered by any other instruction; and it "dealt with some point in the

trial so important, that failure to give the requested instruction seriously impaired

the defendant's ability to conduct his defense." *Lighty*, 616 F.3d at 366.

It was no surprise that reliance-on-counsel was Snyder's primary defense at

trial. It was the same explanation that caused the U.S. Attorney's Office to decline

prosecution of Snyder in 2018 (a decision that was eventually reversed when the case was re-assigned to assistant United States attorney Leo Wise).[6]

The district court ultimately found that there was no evidentiary basis for the instructions and refused to give it. The court specifically relied on the fact that one of Snyder's attorneys, Andrew Graham, was not present at Snyder's meetings with UMMS, and that Graham was not aware of the specific terms of Snyder's proposed consultancy with UMMS. JA2388. (The court never made any mention of Snyder's other attorney, Eric Yaffe, in reaching its decision.)

The court was wrong for at least three reasons. First, the court applied the wrong standard when it analyzed whether Snyder was entitled to the instruction. The court should have applied a *prima-facie* standard and determined whether there existed an "evidentiary foundation" for the instruction, *Powell*, 680 F.3d at 356, or whether evidence presented by Snyder "supports the theory or defense in the instruction." *Gray*, 47 F.3d at 1369. Instead, the court acted as if it were the final arbiter of fact charged with determining whether the defense was valid. In doing so, the trial court supplanted the role of the Jury and prevented Snyder from having his defense heard by the Jury.

---

[6] The Government's closing memorandum declining to prosecute Snyder, read aloud by the court, stated: "It was determined based on the facts of the investigation there was no criminal intent by Steven Snyder to extort the UMMS because Snyder was willing to include Andy Graham and members of the UMMS board." JA834.

Second, the court wrongly found that the instruction was not merited because Graham had not been present for Snyder's meetings with UMMS. In jumping to this conclusion, the court ignored evidence that Snyder repeatedly attempted to have Graham attend at least one meeting with UMMS, and to have Graham be present for his presentation to the UMMS Board, but his efforts were thwarted by the Government. *See* JA1311. While this would not negate the fact that Graham, ultimately, was not present, this was certainly evidence the Jury was entitled to consider under the advice-of-counsel instruction. Snyder's desire to have Graham attend his presentation to UMMS (the same presentation the Government contends was extortionate) suggested that Snyder was being completely transparent about his conduct – which in turn suggests lack of intent. This was relevant to his state of mind in his dealings with UMMS.

It was also relevant – and a matter for the Jury to consider – that Snyder repeatedly urged UMMS's lawyers, Natalie Magdeburger and Sue Kinter, to speak with Graham directly, even outside his presence. When Magdeburger finally called Graham, the two discussed "whether [a deal] could be done ethically." JA1444. Graham explained to her that the proposal called for Snyder to act "as sort of an internal cop with some kind of powers to make sure that things were being done right." JA1444. Again, this did not put Graham directly in the meetings with

32

Snyder and UMMS officials, but it demonstrated that Graham was firmly in the loop as negotiations were underway.

Finally, the court was wrong to conclude that Graham was not aware of the specific terms of Snyder's proposed consultancy. To begin with, the evidence established that the parties had not yet agreed on any terms, and thus, there were no *final* terms for Graham to be aware of.

There was plenty of evidence, meanwhile, demonstrating that Graham knew the critical contours of Snyder's proposal: Graham testified that he knew a fee of $25 Million had been floated (JA1433); that he advised Snyder on what he could do for UMMS as a consultant (and that there was nothing wrong with such a consultancy); and that he gave Snyder two draft agreements, where the parties could fill in the blanks once the terms had been agreed upon. JA1428-1429; JA1430-1431. Graham also knew that the consultancy was being proposed in connection with a malpractice claim that Snyder was trying to settle.[7] JA1425, JA1441.

---

[7] The Court also knew that Graham was aware of Snyder's malpractice claims against the hospital, and in fact, Graham urged Snyder to meet with the UMMS Board and tell them of the "major ramifications" his case would have for the hospital. *See* JA2294-2295. Snyder informed the court of an email he received from Graham on August 7, 2018 – preceding his recorded August 23rd meeting with UMMS – in which Graham stated: "I suggest that you advise the Board … that you wish to meet personally with the Board to discuss the case, its implications for the hospital and the terms on which it should be settled. … This case has major ramifications for the hospital and it should welcome the opportunity

The depth of communication and understanding between Graham and Snyder, moreover, was demonstrated by an August 8, 2018, email from Snyder to Graham that made clear Snyder was attempting to avoid any appearance of extortionate conduct:

> Letter to make sure there is no ambiguity opportunity to hire my firm as consultants over a period certain for a determined fee, to offer confidentiality and to be available if cases arise against the organ department to settle the Sanders matter. In summary, this is not a plan to extort money to avoid public exposure. I will help keep this department on the straight and narrow and you will pay me for my firm's expertise.

JA1426.

Snyder also addressed the same concerns in discussions with another lawyer, Eric Yaffe, who explained, "I was concerned about the potential for extortion and wanted to ensure that Mr. Snyder understood that, and Mr. Snyder, you know, responded to what I had suggested to him." JA1336.

These exchanges suggest not that Snyder was withholding facts from his attorneys, but that he was making fulsome disclosures.[8]

---

to learn as much about your client's claim as possible so that they can fulfill their fiduciary responsibilities and make responsible decisions." *Id*. Snyder read this email into the record outside of the Jury's presence, but he mistakenly forgot to enter it into evidence. JA2293-2294.

[8] The Government improperly asked each of Snyder's attorneys a leading "gotcha" question at the end of their respective direct examinations: "[D]id you ever advise Mr. Snyder that he could seek his consultancy by threatening to destroy the transplant department at the University of Maryland?" JA1336. While these

Snyder's efforts to seek the advice of an attorney were rooted in the medical malpractice case of his client, Michele Sanders. Sanders demanded as part of her settlement that Snyder be hired as a consultant for UMMS – but Snyder did not know how to set up this type of arrangement. In an attempt to do it the right way, Snyder retained at least three attorneys to advise him: Eric Yaffe, John McNutt, and Andrew Graham.

Snyder paid Yaffe's and McNutt's firm "to represent him and his firm in the development of the strategy for a potential action that included reviewing and working on a demand letter, a potential complaint, and otherwise providing research and advice for a potential action." JA1332. The firm also provided research and a letter of advice in preparation for Snyder's June 22, 2018, meeting with UMMS. JA1342-1343.

Snyder's deployment of his attorneys in this manner was not the action of someone who was attempting to withhold information from them.

In sum, the evidence demonstrated that Snyder was acting in response to the request of his client, he hired multiple lawyers, and he communicated with counsel consistently over the course of his efforts. He may not have established the *perfect* record to obtain an advice-of-counsel instruction, but he did establish a *sufficient*

---

questions were certainly intended to have a dramatic effect on the Jury, they deserve no weight in this Court's analysis.

record. A reasonable Jury could have concluded that these efforts constituted a "full and complete report to his lawyer" – and that Snyder acted in good faith. *See* MFJI-C, ¶ 8.4. The court abused its discretion by acting as a final arbiter of facts, denying the instruction, and precluding Snyder from presenting his full defense to the Jury. Reversal is warranted.

## III. THE DISTRICT COURT ERRED WHEN IT LIMITED THE TESTIMONY OF A CRITICAL WITNESS BECAUSE OF A CIVIL NON-DISCLOSURE AGREEMENT.

The trial court erred when it prevented Snyder's most important witness, Michele Sanders, from testifying about her settlement with UMMS. The court barred her testimony because Sanders' settlement with the hospital included a confidentiality or non-disclosure provision. In precluding her testimony, the court violated Snyder's Sixth Amendment right to compulsory process and Fifth Amendment right to due process.

Sanders was the widow of Jeffrey Sanders, whose failed kidney transplant (and ultimate death) led to the malpractice claim that Snyder pursued against UMMS. Sanders was the impetus behind Snyder seeking a consultancy agreement: the evidence at trial established that it was Sanders who demanded, as part of her settlement, that the hospital employ Snyder as a consultant so that what happened to her husband "would never, ever, ever happen to anyone again." JA2159. She

even included this in her list of demands that was provided to UMMS at a mediation meeting. JA2159-2160, JA2166-2167, JA2169.

Sanders was important to Snyder's defense because she could describe the following: (1) the consultancy was her idea, (2) the failures and negligence she experienced at the hands of UMMS, (3) any admissions made by UMMS during her settlement, and (4) any remedial measures that the hospital took in response to her complaint. *See* JA2185-2186. Sanders' testimony was particularly critical because it went not only to Snyder's state of mind with respect to the consultancy (and how it was intended to be part-and-parcel of Sanders' settlement), but also to his belief and understanding of problems at the transplant department, which justified his warnings to the hospital about the consequences it could face if the case did not settle (and he were forced to file suit).

But almost immediately into her testimony, Sanders was unable to answer Snyder's questions, stating, "I can't talk about that," or "I'm not permitted to answer that question." JA2145, JA2146. Sanders' counsel was permitted to repeatedly object to Snyder's questions, on the grounds that the testimony elicited might violate the nondisclosure agreement Sanders signed with UMMS. JA2147. Sanders' counsel said she could testify about the consultancy, but not about the issues leading to her settlement. JA2147-2148. The court, while implicitly recognizing its authority to direct Sanders to respond, gave primacy to the

37

nondisclosure agreement and in the process cast aside Snyder's constitutional right to present his defense.

The court's ruling in the instant case materially harmed Snyder's defense because it precluded him from introducing evidence that the hospital had admitted specific acts of wrongdoing and had taken remedial actions as a result of Sanders' complaint. Snyder proffered to the court that, among other things, UMMS changed its informed consent process – presumably regarding high-KDPI kidneys – and it took down promotional videos for its transplant department. JA2185-2186. This was important because the informed consent process – which Sanders claimed was not followed in her husband's case (*see* Govt. Ex. 201, 203)[9] – was one of the bases for Snyder's claims of fraud against UMMS. Snyder was precluded from saying more, and from presenting any of this information to the Jury. JA2186. This evidence, if it had been allowed, likely would have established that Snyder was not acting wrongfully when he sought a consultancy with UMMS – and therefore not guilty of extortion.

The Sixth Amendment guarantees a defendant's right to call witnesses in his own defense. When this right is abridged, the defendant's due process rights may be violated. "Few rights are more fundamental than that of an accused to present

---

[9] These exhibits were admitted at trial and are included in the Digital Media volume of the Joint Appendix (Vol. X).

witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

"Just as an accused has the right to confront the prosecution's witnesses for the

purpose of challenging their testimony, he has the right to present his own

witnesses to establish a defense. This right is a fundamental element of due process

of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

When the defendant's right to put on his defense comes in conflict with

another interest, such as state court law, the court must weigh the competing

interests against each other. *See Rock v. Arkansas*, 483 U.S. 44, 56 (1987)

(permitting defendant to testify despite violation of a competing state-court law);

*Chambers*, 410 U.S. at 302 (allowing cross-examination of a witness despite

violation of a competing state-court law).

In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982), the

Supreme Court suggested that to prevail on a Sixth Amendment claim, the

defendant "must at least make some plausible showing of how [the] testimony

would have been both material and favorable to his defense." The Court went on to

recognize that there may be inherent difficulties in establishing materiality. "In

making such a determination, courts should afford some leeway for the fact that

the defendant necessarily proffers a description of the material evidence rather than

the evidence itself." *Id*. at 874.

In the instant case, Snyder's constitutional right to put on witnesses in his own defense came into conflict with state contractual law that ostensibly forbade Sanders from revealing the terms of her settlement agreement. The trial court made two errors when trying to resolve this conflict.

First, the court never seemed to acknowledge that the non-disclosure portion of Sanders' contract apparently permitted her to make disclosures pursuant to a court order. Although the document was never entered into the record, Sanders' attorney stated that "there is language in one portion of it that disclosure of the terms is permitted by me as may be required to enforce the terms of the release or as required by court order." JA2104. The trial court seemed to ignore that and ruled that, although Snyder could ask Sanders the settlement amount (which was already in evidence), the court would "not order her to otherwise violate the nondisclosure agreement and that includes discussing the underlying case with her husband." JA2105.

The second error the court made was not weighing Sanders' state-law contractual concerns against Snyder's competing constitutional right to present his defense to the Jury. If the court had undertaken this comparison, the analysis would have been one-sided. Snyder's constitutional rights to a fair trial easily outweigh any concerns about making public the terms of this settlement agreement. Yet the

trial court skipped this analysis completely and ruled to curb the testimony of the woman who was at the center of Snyder's defense.

And Sanders was arguably Snyder's most important witness. Her testimony served multiple purposes. First, she could have supported Snyder's contention that UMMS had engaged in widespread misconduct in its kidney transplant program. Second, Sanders could have explained why she gave Snyder a mandate to take on a consultancy – with the goal of reforming the transplant program and ensuring that no more patients were harmed. And, perhaps most importantly, Sanders' testimony could have established that Snyder's efforts at obtaining a consultancy were not wrongful – for the reason that Snyder legitimately believed there existed systemic problems within UMMS's transplant program.

Yet, the district court blocked Sanders' testimony at nearly every turn. From the outset, when Snyder asked Sanders what her goals were and what she wanted to accomplish through the consultancy, Sanders said, "I can't talk about that." JA2145. The court instructed Snyder to "move on." JA2145. When asked why money was not important to her, she again said, "I can't talk about that." JA2145. Snyder was again forced to move on. JA2146. When asked whether she had done any research regarding the issues with UMMS's transplant department prior to retaining Snyder, Sanders again responded, "I'm not permitted to answer that question." JA2146. When asked whether she was satisfied with her settlement, *her*

attorney objected. JA2155. The court brushed Snyder aside, stating, "I don't think that's permissible." JA2155.

Snyder also attempted to question Sanders about her initial demand to UMMS; a meeting she had with Dr. Bartlett (demanded as part of her settlement); the changes UMMS made in the transplant department as part of her settlement; the doctors who had been involved in her husband's care; and whether any of those doctors had departed from the hospital. JA2173, JA2176, JA2179-2180, JA2185, JA2187. Each time, Sanders' lawyer lodged an objection from the gallery. *See* JA2173 (Sanders' lawyer was "standing up in the back"); JA2176 (Sanders' lawyer states, "Your Honor, I think this goes to the agreement"); JA2178 (Sanders' lawyer states, "I think [that] is a clear violation of the NDA"); JA2185 (Court: "I've got her counsel from the gallery objecting to this"); JA2187 (after Sanders' counsel interjects, court states, "that's excluded by the … nondisclosure agreement"). When Snyder attempted to challenge the court's rulings, it made him seem argumentative and defiant in front of the jury. *See*, *e.g.*, JA2173 (Snyder asks court, "Well, how does he get to interrupt this case?", and the court responds, "let's move on"); JA2185 (Snyder says Sanders' counsel is "wrong," and court admonishes him, stating, "Mr. Snyder, please do not argue with anyone in the courtroom").

The district court's erroneous rulings not only prevented Snyder from putting on his defense, but the multiple sustained objections – and Snyder's efforts to challenge those rulings – also made Snyder look bad to the Jury while questioning his own witness (and former client). Sanders' obligations under the nondisclosure agreement, and any privacy interest of UMMS in that agreement, had to be secondary to Snyder's right to compulsory process, his right to put on a defense, and his right to a fair trial. By precluding Sanders' testimony, the district court violated these rights. This error requires reversal.

## IV. THE DISTRICT COURT ERRED WHEN IT REFUSED TO VOIR DIRE THE JURY REGARDING THE COURT'S CONTEMPT FINDING AND OVERNIGHT INCARCERATION OF SNYDER.

The district court erred when it refused to question the jury to determine whether any juror had learned that Snyder had been held in criminal contempt and jailed the night before. Snyder had a constitutional right to a fair and impartial jury, and he had a right to know whether any juror had been exposed to and improperly influenced by the news of Snyder's midtrial incarceration. This case garnered a significant amount of publicity, with articles and reports in the news each day of trial. *See* JA2530-2531 (Government acknowledged that there were stories in the news every night of the trial). Under these circumstances, the district court should have *voir dired* the Jury to ensure that they remained impartial and eligible to serve.

An impartial and unbiased jury is fundamental to a fair trial. A defendant is entitled to a new trial when the jury is exposed to prejudicial information, including publicity, that was not introduced at trial. *United States v. Barnes*, 747 F.2d 246, 249 (4th Cir. 1984); *see also*, *United States v. Bassler*, 651 F.2d 600, 602 (8th Cir. 1981) (cited approvingly in *Barnes*) ("Extrinsic or extraneous influences include publicity received and discussed in the jury room… [and] may be grounds for impeaching a verdict"). Such extrinsic or extraneous information is prejudicial when there is a "reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." *Id*. (citations omitted). If the improper material has been made available to the jury, prejudice may be presumed, *Barnes*, 747 F.2d at 251; but when prejudice cannot be presumed, the trial court should voir dire the jurors to determine if actual prejudice exists. *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991).[10]

On November 21, 2024, after closing arguments and on the evening before the Jury would begin its deliberations, the district court found Snyder in criminal contempt and sentenced him to one night in jail. JA2520. The next morning, before the Jury was brought in, Snyder asked the court to *voir dire* the jury regarding the

---

[10] Although *Bakker* deals with change of venue based on pretrial publicity, there is no reason that the process for determining potential juror bias from publicity should not be applicable here. Questioning the jurors as Snyder requested would not have been overly burdensome, and this was a minimally-disruptive way of safeguarding Snyder's right to a fair and impartial jury.

contempt proceedings. He explained that WBAL-TV, a local television station and news broadcaster, had run a story on the evening news about Snyder having been found in contempt and being jailed overnight. JA2529. Snyder was concerned about the prejudice he would suffer if any of the jurors had seen it. Thus, Snyder requested that the court ask the jurors if any of them had seen any news coverage about the case over the last three days, and then to conduct individual *voir dire* only of anyone who answered "yes." JA2529, JA2532. The Government objected, arguing that the court's general instructions regarding media were sufficient. JA2530-2531.

The court denied Snyder's request based on: (1) her daily admonishment to the jury not to discuss or research the case; (2) her standard jury instruction on publicity; (3) the lack of any indication that any juror had read the news or would be influenced by the news; and (4) the court's opinion that doing so would draw more attention to the situation. JA2532.

The court's ruling was erroneous for several reasons. First, the court's daily admonishment that jurors refrain from discussing or researching the case did not foreclose the possibility that any of them were exposed to news accounts of the contempt finding. Jurors could be watching television – including the evening news – without any intention of researching or discussing the case, and could still be exposed to press coverage of the trial. Even if they were not specifically

watching the news, they could have been watching evening television and been exposed to previews of the news – including the breaking news that a well-known attorney-turned-defendant had been held in contempt and jailed by the court. Jurors could also have been exposed to this information while simply listening to the radio on their drive home.

Nor was the court's finding that there was no indication that any juror had read or would be influenced by the news, proper. The incident had occurred the night before, after the jurors had been dismissed, and Snyder made his request first thing the following morning, before the Jury entered the courtroom. The only way for the court to know whether any juror had been exposed to or might be influenced by the news, was to ask. Snyder also structured his question so that it would not draw more attention to the situation, contrary to the court's finding. Specifically, he sought to ask whether the jurors had seen any press coverage of the trial in the preceding *three* days. This would adequately expose any jurors who had seen the coverage in question, without signaling to the jurors any specific incident from the day before. The court should have questioned the Jury, and its failure to do so deprived Snyder of the opportunity to ferret out jurors who might have been exposed to and influenced by negative media coverage of him.

The court's refusal to question the Jury also precluded Snyder from establishing any potential prejudice. The question here is whether any member of

46

the jury heard news of this, and if so, whether there is "a reasonable possibility that the jury's verdict was influenced by" the news. *Barnes*, 747 F.2d at 250. Because of the court's refusal to conduct *voir dire*, it is impossible for Snyder to make this showing. However, it is difficult to imagine anything more prejudicial to a *pro se* criminal defendant – particularly one who is a lawyer – than being thrown in jail for contempt of court.

As noted, this was a trial that garnered an extraordinary amount of media interest, highlighted by the court's contempt finding, which was covered prominently by most local news outlets on November 21, 2024. Based on the pervasiveness of daily news, whether through traditional or social media, there is at least a reasonable probability that at least one juror was exposed to the facts of the court's contempt order. Moreover, it would be hard to imagine that such a juror would not be affected by this information, particularly when considering the nature of this case and this defendant. The court erred in refusing to *voir dire* the Jury, and preservation of Snyder's fundamental right to an impartial jury requires that his convictions be reversed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Appellant respectfully requests that this Honorable Court vacate his convictions and grant any other appropriate relief.

## **REQUEST FOR ORAL ARGUMENT**

Appellant requests oral argument on the matters presented in this appeal.


Respectfully Submitted,



_____/s/_____
C. Justin Brown
Lylian Romero
Brown Law
233 E. Redwood Street, Suite 1000C
Baltimore, MD 21202
Phone: (410) 244-5444
Fax: (410) 934-3208
brown@cjbrownlaw.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief of the Appellant has been prepared using Microsoft Word software, Times New Roman font, 14-point proportional type size.

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of authorities; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains 11,208 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

                        _____/s/_____
                        C. Justin Brown, Esq.
                        Brown Law
                        233 E. Redwood Street, Suite 1000C
                        Baltimore, MD 21202
                        Phone: (410) 244-5444
                        Fax: (410) 934-3208
                        brown@cjbrownlaw.com

                        *Counsel for Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of August, 2025, a copy of the foregoing Opening Brief was served via ECF on David Bornstein, Assistant United States Attorney.

_____/s/_____
C. Justin Brown