**No. 25-4218**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Plaintiff - Appellee,**

**v.**

**STEPHEN L. SNYDER,**

**Defendant - Appellant.**

---

*Appeal from the United States District Court for the
District of Maryland, Northern Division
Honorable Deborah L. Boardman, District Judge*

---

**RESPONSE BRIEF OF APPELLEE
UNITED STATES OF AMERICA**

---

**Kelly O. Hayes**
**United States Attorney**

**David C. Bornstein**
**Assistant United States Attorney**
**Chief, Appellate Division**

**M.J. Kirsch Muñoz**
**Assistant United States Attorney**
**6406 Ivy Lane, 8th Floor**
**Greenbelt, Maryland 20770**
**(410) 736-8276**

**December 17, 2025**                    *Attorneys for the Appellee*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 2

STATEMENT OF THE ISSUES.................................................................. 2

STATEMENT OF THE CASE..................................................................... 3

    A.    Snyder's Criminal Conduct ................................................... 3

    B.    Procedural History............................................................... 12

          1.    The *Faretta* Hearings ............................................... 12

          2.    Trial and Sentencing .................................................. 13

SUMMARY OF THE ARGUMENT .......................................................... 14

ARGUMENT .............................................................................................. 16

I.    THE DISTRICT COURT DID NOT ERR IN ALLOWING SNYDER TO REPRESENT HIMSELF............................................... 16

    A.    Standard of Review ............................................................. 16

    B.    The *Faretta* Hearings Ensured That Snyder Was Competent, and the District Court Had No Reason to Doubt That Conclusion.................. 17

II.    THE DISTRICT COURT DID ABUSE ITS DISCRETION IN DECLINING TO INSTRUCT THE JURY ON THE ADVICE-OF-COUNSEL DEFENSE ......................................................................................... 29

    A.    Standard of Review ............................................................. 29

    B.    The Advice-of-Counsel Instruction Lacked an Evidentiary Foundation.................................................................................. 29

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN IM-
        POSING LIMITATIONS ON SNYDER'S QUESTIONING OF SAND-
        ERS ......................................................................................................38

        A.    Standard of Review ..............................................................38

        B.    The Court's Limitations on Snyder's Examination Were Reasonable
              ..............................................................................................38

IV.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DE-
        CLINING TO QUESTION THE JURY ABOUT A MIDTRIAL NEWS-
        CAST ....................................................................................................47

        A.    Standard of Review ..............................................................47

        B.    There Was No Substantial Reason to Fear Prejudice From the Con-
              tempt-Related Newscast ......................................................47

CONCLUSION ....................................................................................................56

CERTIFICATE OF COMPLIANCE ..................................................................57

CERTIFICATE OF SERVICE ............................................................................58

# TABLE OF AUTHORITIES

## CASES

*Baker v. Goldman Sachs & Co.*,
 669 F.3d 105 (2d Cir. 2012) ........................................................40

*Batey v. Haas*,
 573 F. App'x 590 (6th Cir. 2014)..........................................39, 40

*Burket v. Angelone*,
 208 F.3d 172 (4th Cir. 2000) ....................................................22

*Crane v. Kentucky*,
 476 U.S. 683 (1986)....................................................................44

*Delaware v. Van Arsdall*,
 475 U.S. 673 (1986)...............................................................39, 40

*Dorman v. Annapolis OB-GYN Assocs., P.A.*,
 781 F. App'x 136 (4th Cir. 2019)..............................................46

*Dusky v. United States*,
 362 U.S. 402 (1960)....................................................................21

*Faretta v. California*,
 422 U.S. 806 (1975)....................................................................12

*Gagne v. Booker*,
 680 F.3d 493 (6th Cir. 2012) ....................................................44

*Godinez v. Moran*,
 509 U.S. 389 (1993)...............................................................21, 24

*Gov't of Virgin Islands v. Dowling*,
 814 F.2d 134 (3d Cir. 1987) ......................................................53

*Grayson O Co. v. Agadir Int'l LLC*,
 856 F.3d 307 (4th Cir. 2017) ....................................................22

*Indiana v. Edwards*,
 554 U.S. 164 (2008)...............................................................24, 26

*Jones v. Wellham,*
    104 F.3d 620 (4th Cir. 1997) ......................................... 47, 48, 50, 51, 52, 55

*Jordan v. Hepp,*
    831 F.3d 837 (7th Cir. 2016) ........................................................25

*Mathews v. United States,*
    485 U.S. 58 (1988)........................................................30

*Michigan v. Lucas,*
    500 U.S. 145 (1991)........................................................43

*MidAtl. Int'l Inc. v. AGC Flat Grass N. Am., Inc.,*
    594 F. App'x 105 (4th Cir. 2014) (per curiam)...........................................54

*Rock v. Arkansas,*
    483 U.S. 44 (1987)........................................................39

*Washington v. Boughton,*
    884 F.3d 692 (7th Cir. 2018) ........................................................25

*United States v. Audette,*
    923 F.3d 1227 (9th Cir. 2019) ........................................................25

*United States v. Avenatti,*
    81 F.4th 171 (2d Cir. 2023) ..................................................35, 42

*United States v. Banks,*
    482 F.3d 733 (4th Cir. 2007) ........................................................28

*United States v. Beckton,*
    740 F.3d 303 (4th Cir. 2014) ........................................................39

*United States v. Bernard,*
    708 F.3d 583 (4th Cir. 2013) ......................................... 17, 23, 24, 26, 27, 28

*United States v. Berry,*
    565 F.3d 385 (7th Cir. 2009) ..................................................24, 29

*United States v. Brant,*
    188 F.3d 503 (4th Cir. 1999) (per curiam) (table)........................................46

*United States v. Brewbaker*,
  87 F.4th 563 (4th Cir. 2023) ...........................................................49

*United States v. Burleigh*,
  145 F.4th 541 (4th Cir. 2025) .........................................................47

*United States v. Cousar*,
  539 F. App'x 83 (4th Cir. 2013) (per curiam) .......................................30, 37

*United States v. Ferris*,
  704 F. App'x 225 (4th Cir. 2017) .....................................................41

*United States v. Frazier-El*,
  204 F.3d 553 (4th Cir. 2000) ...........................................................21

*United States v. Grande*,
  620 F.3d 1026 (4th Cir. 1980) ....................................................49, 50, 52

*United States v. Gray*,
  47 F.3d 1359 (4th Cir. 1995) ...........................................................29

*United States v. Hankish*,
  502 F.2d 71 (4th Cir. 1974) ............................................................48

*United States v. Hawley*,
  768 F.2d 249 (8th Cir. 1985) .......................................................54, 55

*United States v. Householder*,
  137 F.4th 454 (6th Cir. 2025) .........................................................37

*United States v. Jackson*,
  627 F.2d 1198 (D.C. Cir. 1980) .......................................................54

*United States v. Jackson*,
  126 F.4th 847 (4th Cir. 2025) ..........................................................4

*United States v. James*,
  328 F.3d 953 (7th Cir. 2003) ..........................................................22

*United States v. Johnson*,
  610 F.3d 1138 (9th Cir. 2010) ....................................................24, 25, 27

*United States v. Jones*,
 542 F.2d 186 (4th Cir. 1976) ......................................47, 48, 51, 55

*United States v. Jones*,
 65 F.4th 926 (7th Cir. 2023) ..........................................................28

*United States v. King*,
 582 F.2d 888 (4th Cir. 1978) ..........................................................18

*United States v. Lighty*,
 616 F.3d 321 (4th Cir. 2010) ...................................................30, 36

*United States v. Nsahlai*,
 121 F.4th 1052 (4th Cir. 2024) .......................................................37

*United States v. Olano*,
 507 U.S. 725 (1993).........................................................................17

*United States v. Powell*,
 680 F.3d 350 (4th Cir. 2012) .......................................29, 30, 34, 36

*United States v. Promise*,
 255 F.3d 150 (4th Cir. 2001) ..........................................................54

*United States v. Shareef*,
 852 F. App'x 92 (4th Cir. 2021) ...............................................29, 30

*United States v. Singleton*,
 107 F.3d 1091 (4th Cir. 1997) ........................................................18

*United States v. Traitz*,
 871 F.2d 368 (3d Cir. 1989) .............................................33, 34, 35

*United States v. Taylor*,
 No. 21-4601, 2024 WL 1045228 (4th Cir. Mar. 11, 2024) (per curiam)......20

*United States v. Westbrooks*,
 780 F.3d 593 (4th Cir. 2015) ...................................................30, 34

*United States v. Williams*,
 809 F.2d 1072 (5th Cir. 1987) ..................................................54, 55

vii

*United States v. Woods*,
   710 F.3d 195 (4th Cir. 2013) ........................................................38, 40, 41, 44

*United States v. Ziegler*,
   1 F.4th 219 (4th Cir. 2021) .................................................17, 20, 21, 23, 26

## STATUTES

18 U.S.C. § 1951(b) ........................................................................................12

18 U.S.C. § 1952(a)(3)....................................................................................12

18 U.S.C. § 1952(b)(2)....................................................................................12

18 U.S.C. § 3231 ..............................................................................................1

18 U.S.C. § 4241(a) ........................................................................................27

28 U.S.C. § 1291 ..............................................................................................1

# INTRODUCTION

In 2018, defendant-appellant Stephen Snyder tried to wangle a personal payment of $25 million from the University of Maryland Medical System (UMMS). He claimed to have unearthed fraud in UMMS's organ transplant program while investigating his client's malpractice claim against the hospital.   Armed with what he claimed he knew about the program, and in truth not caring that he was mistaken, Snyder told UMMS representatives that he would destroy the transplant program, the hospital, and the careers of its employees if UMMS did not agree to a $25 million consulting arrangement.   Yet that arrangement, Snyder explained, would not obligate him to do any work.   It would not be part of any settlement that the hospital reached with his client, whose interests Snyder still (purportedly) represented.   And it would certainly not require Snyder to share the $25 million payment with his client, who allegedly approved of the consultancy but actually knew nothing about it— and, in fact, would have discouraged it had she been told of the details.

This was not zealous advocacy.   This was extortion—in the form of a sham, self-interested agreement sought by threats of economic and reputational ruin.   And in November 2024, a jury agreed, finding Synder guilty of attempted Hobbs Act extortion and multiple Travel Act violations after a nine-day trial.   Snyder now wants a do-over, but none of his claims of error demands that result.   He was not

1

denied his constitutional rights when the district court let him represent himself after two *Faretta* hearings in which he repeatedly insisted that he was not only competent but better than the average lawyer as a 50-year practicing attorney.  Nor did the court abuse its discretion in making any of the trial rulings that Snyder challenges here, none of which prejudiced his case anyway.   The Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Snyder's federal offenses.   18 U.S.C. § 3231.   It entered a judgment of conviction against him on April 3, J.A.2790, and Snyder timely appealed on April 15, 2025, J.A.2796.   This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in allowing Snyder to represent himself after a magistrate judge twice concluded that Snyder was competent to waive counsel in separate and extensive *Faretta* colloquies, and when nothing in the pretrial or trial proceedings gave the court reason to doubt these conclusions.

II.    Whether the district court abused its discretion in declining to instruct the jury on Snyder's proposed advice-of-counsel defense when no evidence suggested that his attorneys were aware of the tactics Snyder used in his attempt to obtain the consulting agreement, and when all of them testified that they knew almost

2

nothing about what the parties had discussed.

III.    Whether the district court abused its discretion in placing limitations on Snyder's examination of his former client when those limitations were not disproportionate to the competing concerns at play.

IV.    Whether the district court abused its discretion in declining to interrogate the jury about a midtrial newscast allegedly discussing the court's contempt finding against Snyder, when its plenary admonitions and instructions throughout trial adequately guarded against the prospect that any juror had seen the alleged newscast, much less been prejudiced by it.

## STATEMENT OF THE CASE

For 50 years, Stephen Snyder was a prominent medical malpractice attorney in Baltimore.   By the time of trial, he was 77 years old and suffered some of the common ailments attendant to old age: declining motor skills, "mild" cognitive issues, and disorganization.   J.A.3295.   These same ailments, he told the court at sentencing, may have also been attributable to Parkinsonism, his doctor's inconclusive diagnosis a month after trial.   But either way, Snyder's ailments did not demonstrate incompetence, much less the degree of mental incapacity that would have required the district court to disregard Snyder's repeated insistence on self-representation and usurp his constitutional right to it.   On the contrary, Snyder's comportment smacked

3

of gamesmanship, not ineptitude. He "knew exactly what he was doing" when he bullied witnesses, made inappropriate comments, and ignored the rules and rulings that he thought should not apply to him. J.A.3476; *see* J.A.1509; J.A.1521; J.A.2122. As it turned out, this kind of behavior was nothing new for Snyder, whose actions in 2018—like his conduct at trial—might also be described as "completely out of line, rude, and shocking." J.A.1602.

## A.    Snyder's Criminal Conduct[1]

Snyder's campaign to extort UMMS began with a routine settlement conference in January 2018. He was representing a client, Latresce Bennett, who had received a successful kidney-pancreas transplant at UMMS but experienced difficulties during postoperative care. J.A.1101. Also at the conference were Sue Kinter and Natalie Magdeburger, both attorneys representing the hospital, and Dr. Stephen Bartlett, UMMS's chief medical officer. J.A.1101; *see* J.A.957. The Bennett case would eventually settle. J.A.1120. But at the conference, Snyder pulled Bartlett aside to tell him that he had other clients with claims against UMMS, also ostensibly related to organ transplants. J.A.1101-1102. He asked for Bartlett's phone number, which Bartlett gave him. J.A.1102. As UMMS would later learn, Snyder had

---

[1]    The following facts are derived from the evidence at trial, taken in the light most favorable to the jury's guilty verdict. *United States v. Jackson*, 126 F.4th 847, 852 n.1 (4th Cir. 2025).

only one other client with an alleged transplant-related case against the hospital: Jeffrey Sanders, who, along with his wife Michele, had hired Snyder after complications following Jeffrey's kidney transplant.    J.A.1753;  *see*  J.A.1127-1129; J.A.1419-1420.

After exchanging several texts, Snyder and Bartlett agreed to meet for dinner in March 2018.    J.A.1102-1105.    They arrived at the restaurant with their significant others, who were escorted to the table while Snyder took Bartlett to the bar. J.A.1105; J.A.1177.    Over drinks, Snyder began to make his demands.    He had the maître d' deliver a folder containing graphic post-surgery photos of Jeffrey Sanders and told Bartlett that he had made a video "about the transplant program" and "was prepared to … put it on TV and do newspaper ads if [Bartlett] did not cooperate." J.A.1105-1106.    The "commercials and advertisements would be devastating," Snyder promised, "for the hospital and for [Bartlett] personally."    J.A.1106.    Sick, "shocked and disgusted" inside, Bartlett returned to the dinner table and tried to get on with their evening.    J.A.1106-1107.    Snyder would not let it go, however, telling Bartlett's wife "[r]epeatedly" that "as long as [her] husband does what he wants him to do, everything will be fine."    J.A.1178-1179.[2]

---

[2]   One of the things that Snyder demanded Bartlett do was tell Kinter that UMMS was liable for fraud and punitive damages.    J.A.1109.    Bartlett did so, and then sent Snyder a text confirming that he "explained to [Sue] that we're in jeopardy

Snyder's threats only got worse from there.   In April 2018, he had his first official meeting with UMMS about Sanders's case, with Kinter, Magdeburger, and a third person, Dr. DePriest Whye, representing the hospital.   J.A.958; J.A.1483. They were also accompanied by an associate at Snyder's law firm, Kevin Stern. J.A.1765.   As revealed by Magdeburger's meeting notes, J.A.2813-2821, as well as by Snyder's own prepared remarks, Snyder told the representatives that he had investigated UMMS's transplant program and found "fraud," J.A.2838.   He said that unless the hospital shelled out $25 million to "SILENCE" him and his client Michele Sanders, J.A.2837—by this time, Jeffrey had passed away, J.A.961—he would greatly damage UMMS's reputation and bottom line, J.A.2838-2839.   *See* J.A.958-959; J.A.1485.   This meant, as Snyder then explained, a press conference; a front-page article in *The Baltimore Sun*, which he had already lined up; a TV commercial, which he played for them in the meeting room; and an "Internet bomb," which would link anyone looking for UMMS's transplant website to an ad for his law firm. J.A.959-960;   J.A.1484;   J.A.1766-1767;   J.A.1827.   Although   Snyder   did   not

---

for fraud and punitive damages."   J.A.2805-2807.   At later meetings with UMMS, Snyder used this text as proof of his allegations.   *See* J.A.183, J.A.218; J.A.Vol.X (GX204, 00:07-00:10).   So, too, does Snyder's brief on appeal, Br. 6.   But Bartlett—a physician, not a lawyer—testified that he was not making his own assessment of the hospital's liability.   He was just doing what Snyder told him to do under duress.   J.A.1109.

reference a consultancy at the April meeting, he made clear that the $25 million would not just settle Sanders's claim but would be part of a "deal" to conflict him out of future cases against the hospital.   J.A.2815; *see* J.A.1774.

Kinter, Magdeburger, and Whye left the April meeting "disturbed, very troubled."   J.A.961; *see* J.A.1488.   They were especially "worried" by Snyder's threats because they were premised on allegations of fraud that were unfounded.   J.A.961-962.   Indeed, the "media campaign" that Snyder had referenced at the April meeting, J.A.1487—and would threaten to unleash in every subsequent meeting—reflected a fundamental misunderstanding about UMMS's transplant program and the Kidney Donor Profile Index (KDPI).

The KDPI, as Bartlett and others later testified, is a measure of the expected performance of a kidney.   It allows healthcare professionals "to make appropriate decisions about which recipients are most appropriate for that kidney."   J.A.1098. Kidneys with a lower KDPI "have the longest possible use or function," making them a good match for children or young adults.   J.A.1098; *see* J.A.1834.   By contrast, kidneys with a higher KDPI have a shorter use-expectancy and "are best given to people who are elderly and have less of a need for long-term function."   J.A.1098. That does not make them "bad kidneys," though.   J.A.1822.   In Magdeburger's words, a higher KDPI kidney "is perfectly fine in a 70-year-old person" at "the tail

7

end of [his] life" and living "this horrific lifestyle" on dialysis, "just getting sicker and sicker and sicker." J.A.1834. For most patients, "transplantation is a superior outcome" to "staying on dialysis," even with a high-risk kidney. J.A.1381.

In Jeffrey Sanders's case, he had received a higher KDPI kidney, 97 out of 100. The kidney was one of two donated from the same person; the other had gone to another patient, who "had good graft function and a good outcome." J.A.1393-1394. Unfortunately, Jeffrey Sanders did not have that outcome. J.A.1127-1129; J.A.1419-1420. And while his case was no doubt "horrible," Snyder wanted to use it to promote a "completely false" narrative, J.A.1832: that higher KDPI kidneys were "bad kidneys," and that in the name of "profit over safety," UMMS was systematically "trying to convince uneducated people to take bad kidneys," J.A.1527. As Magdeburger explained, those allegations were not only "absolutely incorrect," they were "dangerous" "because we have a kidney crisis in this country right now," and "hearing an ad like that … could keep [someone] from treatment." J.A.1823.

These facts did not stop Snyder, however. *See* J.A.145-146 (after being confronted with facts, Snyder riposting, "If you're gonna focus on something like that, you're not gonna win against me"; "you're just not seeing … the big picture").[3] On

---

[3] *See also* J.A.85 ("This should not be looked at from a lawyer's perspective"; "it's admissible from a perspective of my campaign."); J.A.150 ("[I]f you're gonna focus on those medical things, this isn't gonna work."); J.A.180 ("The citizen

8

June 22, 2018, he and Stern had a second meeting with UMMS officials, including Kinter and Magdeburger, as well as another attorney, Alicia Reynolds.  J.A.2850. As again detailed by contemporary notes, and as participants later testified, Snyder raised for the first time the idea of a consultancy.  J.A.1774.[4]  He told the attorneys that they should settle Sanders's case for "whatever that was worth" and "personally pay him $25 million" to "consult" for the hospital, which would conflict him out of future cases.  J.A.1490; *see* J.A.1779; J.A.2851.  When Magdeburger asked what Snyder thought he would do for a $25 million fee, Snyder replied, "I could be the janitor."  J.A.1838; *see* J.A.1510.  He then played a new video that he had created, J.A.1492-1493, and repeated his threats of a press blitz "to systematically destroy" UMMS, J.A.1831; *see* J.A.1782-1783; J.A.2851.  "It would be a tragedy if you don't [pay]," he told UMMS, particularly for Kinter, whom he promised would "get fired" if she "let this happen."  J.A.1243-1244; *see* J.A.1490-1491.

Kinter, Magdeburger, and Reynolds "all felt very shaken, threatened" by what occurred at the June meeting.  J.A.1244.  Kinter, especially, was "absolutely stunned," J.A.1493:  "Never … has any plaintiff lawyer ever told me that if I don't

---

doesn't want to hear you talk that this was a good kidney"; they are "not interested in that"); J.A.232 ("[D]on't focus on defenses any more … Focus on how … this will be perceived to the public[.]").

[4]  At some point, Snyder ordered Stern to destroy the notes he had taken at the June 2018 meeting.  Instead, Stern kept them.  J.A.1791-1792.

do what he tells me to do[,] he will destroy the institution for which I've worked so hard," "I would lose my job[,] and professionally my reputation would be impacted," J.A.1491.   Deciding enough was enough, Kinter contacted a criminal-law attorney and later connected with law enforcement.   J.A.1494.

On August 23, 2018, Snyder and Stern met with UMMS for what would turn out to be the last time.   J.A.1497; *see* J.A.1501.   Kinter, Magdeburger, Reynolds, and Whye were all present for the hospital.   J.A.1497.   And now with law enforcement's help, the meeting was recorded.   J.A.60-237.   As that recording would reveal, Snyder—after first trying to confirm that "we're *not* recording this meeting, correct," J.A.71—continued to threaten both a blistering media campaign against UMMS, J.A.85-86, J.A.91, J.A.130, J.A.133-134; J.A.1502-1503, as well as personal and professional fallout for Kinter and Bartlett, J.A.81, J.A.126, J.A.186; J.A.1499-1500.   *See* J.A.256.   He continued to acknowledge that the consulting agreement was "just to cover the rules," telling UMMS multiple times that he did not care what he did for his $25 million fee, J.A.104, and that he may well do nothing for it, J.A.290.   *See* J.A.110.   He also continued to make clear that the consultancy was "separate" from Sanders's claim, J.A.95, JA.100, and that "settling with her doesn't make me go away," J.A.228.   *See* J.A.104-105, J.A.126, J.A.224.   In addition, Snyder admitted that he had "truthfully, not provided undivided loyalty to"

10

Sanders, J.A.123, and made a number of disparaging remarks about her, J.A.354, as he had at earlier meetings, J.A.1503; J.A.1870-1871; J.A.2873.   Before the August meeting concluded, Snyder reiterated his demand to present his consultancy proposal directly to the UMMS board of directors.   J.A.74.

The next month, Sanders's case settled.   J.A.1255.   Meanwhile, Snyder continued to push his consulting proposal in recorded phone calls with Kinter.   J.A.239. This was despite the fact that Snyder was (or should have been) fully aware, by that point, that UMMS had no interest in a consulting agreement and instead viewed his demands as extortion.   *E.g.*, J.A.109 ("we're getting our arms twisted here, we're [being] extorted"); J.A.182 ("our back is against the wall"); J.A.322 ("we don't really want to enter into an agreement"); *see* J.A.114-115, J.A.206.   And in one other notable phone call—this one between Magdeburger and an attorney, Andy Graham, that Snyder had purportedly retained to help him with the consulting agreement—it became clear that Graham had almost no information at all about Snyder's proposal to UMMS, despite Snyder's repeated insistence to Kinter and Magdeburger that Graham had endorsed the consultancy.   "I don't really have any details at all," Graham told Magdeburger a half-dozen times, J.A.304, and could not "sign off" on any arrangement, J.A.301.   *See* J.A.300, J.A.315.

Initially, the Government declined to prosecute Snyder.   *Accord* Br. 9-10.

11

But after additional review, it determined that Snyder's threats against UMMS in pursuit of a sham $25 million consulting arrangement that neither Graham nor (as it turned out) Sanders approved of amounted to criminal conduct.

### B.    Procedural History

In October 2020, a federal grand jury returned an indictment charging Snyder with attempted Hobbs Act extortion in violation of 18 U.S.C. § 1951(b), and seven counts of Travel Act violations under 18 U.S.C. § 1952(a)(3), (b)(2).   J.A.30-47.

### 1.    The *Faretta* Hearings[5]

The year before trial, Snyder's counsel sought leave to withdraw.   J.A.12 (ECF Nos. 124, 125); *see* J.A.2916-2985.   In a hearing on December 8, 2023, a magistrate judge granted counsel's motion and conducted a *Faretta* inquiry to determine whether Snyder, who insisted on representing himself, had validly waived his right to an attorney.   J.A.498.   The judge concluded he did.   In an extensive colloquy, Snyder confirmed his age, education, and prior legal experiences.   J.A.501-505.   He asserted that he understood the charges against him, was familiar with the law, and was able to follow courtroom rules.   J.A.505-509.   He also said that he understood the perils of self-representation, which the judge described in detail.

---

[5]   A *Faretta* hearing determines whether a defendant looking to proceed pro se relinquishes his right to counsel voluntarily, knowingly, and intelligently.   *See Faretta v. California*, 422 U.S. 806, 835 (1975).

J.A.509-512, J.A.519-520.   Accordingly, the magistrate judge allowed Synder to proceed pro se.   J.A.523-524.   He was ultimately appointed standby counsel, Gerald Ruter.   J.A.16 (ECF Nos. 198, 199).[6]

The following year, after several pretrial hearings in which Snyder complained of health-related issues, the district court referred Snyder to the same magistrate judge to conduct a second *Faretta* inquiry.   During that second colloquy on October 30, 2024, occurring just two weeks before trial, the magistrate judge reiterated the consequences of waiving counsel and tried to persuade Snyder to change his mind about representing himself.   J.A.3222-3234.   Snyder was adamant to the contrary, professing to be not only "hundred percent equipped to handle this case," J.A.3239, but also better than any other attorney, J.A.3240.   Again, the magistrate judge found Snyder competent to waive counsel.   J.A.3245-3246, J.A.3247.

## 2.    Trial and Sentencing

Snyder's case went to trial in November 2024.   J.A.21-23.   Over the nine-day trial, the Government introduced 11 witnesses and over 50 exhibits.   J.A.2547-2551.   As for the pro se Snyder, he presented a defense that introduced six witnesses and 11 exhibits of his own.   J.A.2554-2557.   These witnesses included (among

---

[6]   Ruter and a paralegal, Nicole Cozzi (also "Cozzy"), accompanied Synder throughout the remaining pretrial and trial proceedings.   J.A.528; *e.g.*, J.A.826. Synder also engaged a second paralegal, Janelle Gonzalez, for the trial.   J.A.3249.

others) two physicians, Drs. Jesse Schould and Antonio DiCarlo, whom Snyder had

retained to review Jeffrey Sanders's medical case, J.A.2206, J.A.2313; and an ex-

pert, Jonathan Schraub, who explained the purpose of retainer agreements, J.A.2007-

2010. Snyder also used three of the Government's witnesses—Andy Graham, Eric

Yaffe, and John McNutt, all of whom Snyder had hired for legal counsel in 2018—

to try to persuade the jury that he pursued the consultancy "ethically" and "properly."

J.A.1345; J.A.1444, J.A.1460. Beyond all that, Snyder gave opening and closing

arguments, J.A.913, J.A.2462, conducted far-reaching examinations, *e.g.*, J.A.2007-

2010, and made and won numerous objections, *e.g.*, J.A.966-968.

On November 22, 2024, the jury found Snyder guilty of all counts. Months

later, Snyder was sentenced to three years' probation. This timely appeal followed.

## SUMMARY OF THE ARGUMENT

I. The district court did not err in allowing Snyder to represent himself.

Twice it referred Snyder to a magistrate judge for a *Faretta* hearing, and twice the

magistrate judge found that Snyder had validly waived his right to counsel. Snyder

does not challenge the adequacy of these colloquies, nor, indeed, does he challenge

his competence to stand trial or waive counsel. Instead, he argues only that the dis-

trict court should have probed his ability to proceed pro se beyond what the consti-

tutional competency standard requires because, as it turned out, his modest cognitive

14

ailments made him a suboptimal advocate at trial. This argument has no basis in the law, much less in the facts of Snyder's case, and should be rejected.

II.    The district court properly exercised its discretion in declining to instruct the jury on Snyder's proposed advice-of-counsel defense. This Court has made clear that before a defendant is entitled to such an instruction, he must produce an evidentiary foundation for it—which requires at least some evidence that the defendant fully disclosed all pertinent facts to his attorneys. Snyder produced no such evidence here. Among other problems, nothing in the record remotely suggests that his attorneys were aware of the strongarm, extortionate tactics that Snyder used to try to secure his consulting agreement. That ends the inquiry here.

III.    Nor did the court abuse its discretion in limiting Snyder's examination of Sanders to accommodate competing considerations in his case. Those considerations included not only UMMS's and Sanders's shared interest in enforcing the confidentiality provision of their settlement agreement—an interest that Maryland, whose laws underpin the parties' agreement, likewise shares—but also more routine evidentiary and trial management considerations. The modest limitations that the court imposed were not disproportionate to these legitimate concerns. More than that, they did not affect Snyder's ability to present his defense, since the testimony that Snyder sought from Sanders was amply covered by other witnesses. For that

same reason, whatever error might be found in the court's limitations on Snyder's questioning was harmless.

IV.  Lastly, the district court acted within its discretion in declining to poll the jurors about a newscast appearing on the penultimate day of trial, in which the reporter allegedly discussed the court's contempt finding against Snyder.  The court's countless and repeated directives to the jury—to avoid investigating Snyder's case, to alert the court if they had seen or heard "anything that [they] should not," J.A.843, and to disregard outside information anyway—were enough to negate any fear of prejudice that might have otherwise resulted from the newscast.  On top of that, the court was concerned that if it polled the jurors about news reports that they had been avoiding all along, it would aggravate the problem, not relieve it.  This was a prudent worry.  And together with the admonitions and instructions, it justified the court's decision—a decision that was harmless in any event, given the overwhelming evidence of Snyder's guilt.

This Court should affirm.

## ARGUMENT

## I.  THE DISTRICT COURT DID NOT ERR IN ALLOWING SNYDER TO REPRESENT HIMSELF

### A.  Standard of Review

Whether a defendant waived his right to counsel is a legal question reviewed

16

de novo, with "factual competency findings" reviewed "for clear error." *United States v. Ziegler*, 1 F.4th 219, 227 (4th Cir. 2021). Separately, whether the court should have "sua sponte reconsider[ed] its decision that [defendant] was competent" is reviewed "for plain error." *United States v. Bernard*, 708 F.3d 583, 587, 592-593 (4th Cir. 2013). To establish plain error, Snyder must show that the trial court erred, the error was clear and obvious, and the error affected his substantial rights. *Id.* at 588. Even then, this Court has discretion to recognize the error and will not do so unless it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (cleaned up).[7]

## B. The *Faretta* Hearings Ensured That Snyder Was Competent, and the District Court Had No Reason to Doubt That Conclusion

No error occurred in allowing Snyder to represent himself at trial. The Sixth Amendment permits a defendant to "waive the right to counsel and proceed at trial pro se … if the waiver is (1) clear and unequivocal, (2) knowing, intelligent, and voluntary, and (3) timely." *Bernard*, 708 F.3d at 588. "To waive counsel, a defendant must also be mentally competent," meaning he has "sufficient present ability to consult with his lawyer" and "a rational as well as factual understanding of the proceedings against him." *Ziegler*, 1 F.4th at 226 (cleaned up). To ensure these

---

[7] Regardless, Snyder's claims fail under any standard of review, so the result is the same no matter how the Court considers them.

conditions are met, "a trial court must proceed with care" in evaluating a waiver invocation. *United States v. Singleton*, 107 F.3d 1091, 1096 (4th Cir. 1997). Nevertheless, "[w]ith the best vantage point to evaluate competency, a district court retains significant discretion in how to address a defendant's request." *Ziegler*, 1 F.4th at 229. So long as the court "assure[s] itself that the defendant knows the charges against him, the possible punishment[,] and the manner in which an attorney can be of assistance," the waiver is valid and the court may accept it. *United States v. King*, 582 F.2d 888, 890 (4th Cir. 1978).

**1.** The proceedings below clear that standard by a mile. Twice, the district court referred Snyder to a magistrate judge to evaluate Snyder's request to represent himself—once in December 2023 and again in October 2024, just two weeks before trial. And twice, the magistrate judge found that Synder had validly waived his right to counsel.

The 2023 hearing was especially thoroughgoing. In a *Faretta* colloquy that spans almost 30 transcript pages, the magistrate judge ensured that Snyder was made aware of and understood the charges against him, J.A.505-506, the possible penalties, J.A.506, J.A.508, the legal process, J.A.507, J.A.510, the benefits of having an attorney, J.A.510-511, J.A.515, the risks and responsibilities of self-representation, J.A.508-512, and the consequences of handling his own defense, J.A.511-513,

18

J.A.516-517.   On top of that, the judge confirmed that Snyder was educated, J.A.501, and had significant legal experience, J.A.502-505.   The judge established that Snyder was not under the influence of drugs or alcohol, J.A.501, that he was thinking clearly, J.A.501-502, and that he had reached this decision after considerable reflection, J.A.502, J.A.511.   And the judge warned Snyder multiple times that proceeding pro se was "not a good" idea, J.A.519; *see* J.A.511, J.A.520, culminating in efforts to persuade Snyder to reconsider his choice—each time receiving an unmistakable "no."

The October 2024 hearing only cemented Snyder's insistence on self-representation.   Again asked to probe Snyder's waiver, the magistrate judge reaffirmed that Snyder knew what a trial would require of him, J.A.3223-3227, discussed the roles of appointed versus standby counsel, J.A.3230-3233, and repeatedly expressed skepticism that Synder could manage his defense as well as a trained attorney in this field, J.A.3227-3230, J.A.3233-3234.   In response, Snyder was unequivocal.   He thought the judge was "dead wrong" about his abilities.   J.A.3239.   He professed to be "hundred percent equipped to handle this case," both "able to explain it to the jury" and "to articulate an appropriate cross-examination" of the Government's witnesses.   J.A.3239.   He elaborated that "nobody works as hard as me," J.A.3237, J.A.3240, discussing how he has "prepared an opening statement," "prepared cross-

examination for every witness," and "worked, and I'm not embellishing, no less than eight to ten hours every single day," J.A.3236-3237. And while acknowledging the negative reaction that often accompanies pro se representation, J.A.3235, J.A.3243-3245, Synder was adamant that "there's nobody better than me" to handle his case, J.A.3240.

Short of forcing Snyder to accept counsel he clearly did not want, the magistrate judge and district court did everything possible to ensure that Snyder's waiver was competently made. And while "[i]t would have been clear to [almost] everyone in the room that it was not advisable for [Snyder] to represent himself," that is a "different matter" from whether he was able to make that choice in the first place (he was). *United States v. Taylor*, No. 21-4601, 2024 WL 1045228, at *4 (4th Cir. Mar. 11, 2024) (per curiam). The court's efforts on this front were more than enough to allow Snyder to proceed pro se. *See id.* at *5 (valid waiver where "judge repeatedly impressed upon [defendant] the dangers of this decision, flatly told him [it] was unadvisable, … [and] emphasized more than once that [he] did not understand the rules"); *Ziegler*, 1 F.4th at 229 (valid waiver where "court ensured that [defendant] knew the charges against him, understood the process, knew his rights, had some experience in the law, was warned that proceeding pro se was a bad idea, and understood the consequences").

**2.** In reality, Snyder disputes very little of this, only obliquely gesturing to the adequacy of the magistrate judge's *Faretta* colloquies. Instead, he spends most of his argument decrying the district court for refusing to deny his request for self-representation outright, and then for declining to revoke his waiver sua sponte, "despite being on notice of his mental infirmities." Br. 13. This argument falls short in every respect.

*First*, a primer: A defendant who is mentally competent to stand trial is also mentally competent to waive his right to counsel. *See United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000). And "the competence that is required … to waive [the] right to counsel is the competence to *waive the right*," *Godinez v. Moran*, 509 U.S. 389, 399 (1993)—"not the competence to effectively represent oneself," *Ziegler*, 1 F.4th at 227. This is a low bar. It demands no more than a defendant's "sufficient present ability to consult with his lawyer" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). And "while a court *may* impose a higher standard on a defendant before permitting him to waive counsel …, nothing requires a court to do so." *Ziegler*, 1 F.4th at 227 (cleaned up). "[S]o long as he is competent to stand trial under the two-part *Dusky* standard," he is competent to proceed pro se, regardless of whether he is any good at it. *Id.* (cleaned up).

*Second*, some table setting:   Snyder does not actually argue that his "mental infirmities" made him incompetent to stand trial or waive counsel.   Br. 13, 18. This is for good reason.   "Not every manifestation of mental illness demonstrates incompetence," nor does "low intelligence, mental deficiency, []or bizarre, volatile, and irrational behavior."   *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (cleaned up).   The relevant question remains whether Snyder was capable of understanding the charges and assisting in his defense.   Clearly he was.   In every proceeding below, Snyder's behavior was "that of a person able to understand his surroundings," not of someone suffering "mental instability or concrete intellect so deficient that trial is impossible."   *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003).   And the magistrate judge concluded the same, finding that Snyder was not only "competent," J.A.524, but strenuously "committed to representing [him]self," J.A.3249.   At any rate, to whatever extent Snyder now wishes to mount a claim of mental incompetence, that argument is waived because he did not develop it in his opening brief.   *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

*Finally*, the point:   Instead of leaning on incompetence, Synder seems to argue that the district court should have refused or terminated his pro se representation because—at bottom—his alleged cognitive issues made him a bad advocate.   This

22

contention is both legally and factually defective.

      **a.**   Snyder's argument is legally defective because a court is "not required to separately evaluate whether [a defendant] [is] capable of *effectively* representing himself at trial.  It need[s] only evaluate his competence under *Dusky*." *Ziegler*, 1 F.4th at 227 (emphasis added).  And the court here did exactly that when it referred Snyder to the magistrate judge for two *Faretta* hearings, and the magistrate judge, in turn, found Snyder competent to waive counsel both times.  In other words, the court fulfilled its constitutional responsibilities.  And although it was "*permit[ted]* … to force counsel on" Snyder despite the court's satisfaction that he had met the competency standard, it "was not compelled" to do anything more, regardless of Snyder's (allegedly) low, but still above-baseline, level of mental functioning.  *Bernard*, 708 F.3d at 585, 590 (emphasis removed).  Because "the district court applied the correct legal standard," *id.* at 585, it could not have erred in declining to apply a different legal standard that was not required in the first place.

      Snyder seems to acknowledge this.  Besides *Faretta*, which he cites only for its dicta anyway, all of the cases that Snyder mentions (Br. 17-18) deal with a district court's *refusal* to allow pro se representation, as opposed to a *grant* of pro se representation.  The collective holding of these cases is that "the Constitution permits [courts] to insist upon representation by counsel for those competent enough to stand

23

trial … but who still suffer from severe mental illness." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008). But that holding "does not tell a [court] whether" it exceeds the bounds of permissible choice if it does *not* insist on counseled representation for such defendants. *Id.* at 173. Plainly the answer is "no." *See Bernard*, 708 F.3d at 589-591. Though *Edwards* allows a court to foist counsel upon a defendant in limited circumstances, the Constitution also permits, if not expects, courts to honor the choice of a competent-but-mentally-ill defendant to represent himself. *See Godinez*, 509 U.S. at 399-400. Given this apparent pick of options, a court's decision to accept exactly that choice cannot be error. *See Bernard*, 708 F.3d at 590; *see also United States v. Johnson*, 610 F.3d 1138, 1145 (9th Cir. 2010); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009).

**b.** At any rate, Snyder's argument is also factually defective. As any reasonable reading of the record shows, his was not that "exceptional" case for which *Edwards* inquiries are reserved. *Edwards*, 554 U.S. at 177. And none of Snyder's reasons for thinking differently passes muster.

To begin with, Snyder makes a lot of noise about his alleged cognitive problems, but those problems do not rise to the level of "severe mental illness" that *Edwards* contemplates. *Id.* at 178. "The defendant in *Edwards*, for example, suffered from schizophrenia and delusions, was more than once found incompetent to stand

24

trial, and filed several incoherent written pleadings." *United States v. Audette*, 923 F.3d 1227, 1237 (9th Cir. 2019). In another case where *Edwards* (maybe) applied, the Ninth Circuit found significant "[defendant]'s failure to do *anything* at his trial: he conducted no voir dire, gave no opening, gave no closing, conducted no cross-examination, and called no witnesses." *Johnson*, 610 F.3d at 1145. A third *Edwards* example, mentioned in one of Snyder's own cases, "involved a defendant who was functionally illiterate." *Washington v. Boughton*, 884 F.3d 692, 703-704 (7th Cir. 2018) (discussing *Jordan v. Hepp*, 831 F.3d 837 (7th Cir. 2016)). Even there, though, the Seventh Circuit believed that the defendant *should* have been able to represent himself; it upheld the state court's contrary decision only because of the stringent habeas standard, not because it agreed that *Edwards* should actually cover "adults with no or limited literacy." *Id.* (cleaned up). By contrast, Snyder's ailments are modest, whether attributable to age, "vague Parkinsonism," "a huge amount of stress," or all of the above. J.A.3289. Disordered thinking, short-term memory loss, and "mild cognitive impairment," J.A.3295; *see* Br. 26, do not put Snyder in that "narrow class of [*Edwards*] defendants," *Audette*, 923 F.3d at 1237.

Nor were Snyder's in-court performances as bad as his cherry-picked examples make them seem. While perhaps not the same lawyer he was 20 years ago, he scored a number of pretrial wins. J.A.649 (granting Snyder's motion in limine);

J.A.677-679, J.A.687-689 (denying Government's motions to exclude character ev-

idence testimony and to exclude DiCarlo and Schould testimonies); J.A.779-780

(denying Government's motion to exclude Schraub testimony).   He gave opening

and closing statements, the latter of which focused on Snyder's belief that he lacked

"criminal intent," J.A.2475-2476, J.A.2480—if Snyder's argument were accepted, a

defense to the crime of extortion.   Snyder offered exhibits.   J.A.2553.   He lodged

objections and won over a dozen of them.   J.A.966-968; J.A.1326; J.A.1335;

J.A.1393; J.A.1458; J.A.1864; J.A.1878; J.A.1955; J.A.2350; J.A.2359.   He called

his own witnesses and made good points on cross.   *E.g.*, J.A.1005-1006 (effective

cross about consultancy's "nexus" to Sanders's claim); J.A.1816-1817 (effective

cross about Snyder's knowledge); J.A.2007-2011, J.A.2013-2016, J.A.2018-2021

(effective direct about propriety of consultancy proposal).   In short, he displayed all

the indicia of an "ability to consider strategic choices, develop a defense strategy,

and operate in a courtroom."   *Ziegler*, 1 F.4th at 231.   These indicia prove not only

Snyder's competence to waive counsel but also his "competence to conduct trial

proceedings by [himself]."   *Edwards*, 554 U.S. at 178; *see Ziegler*, 1 F.4th at 231;

*Bernard*, 708 F.3d at 591-592.

Lastly, and "alternatively," Snyder criticizes the court for failing to sua sponte

revoke his validly made waiver after seeing his in-court performances.   Br. 15.   But

this claim, too, fails—under "plain error review" or otherwise. *Bernard*, 708 F.3d at 592. For one thing, the court was not deaf to Snyder's health-related complaints at the pretrial hearings. Likely spurred by exactly these complaints, the court referred Snyder to the magistrate judge for his second *Faretta* hearing two weeks before trial. As discussed, the magistrate judge found that Snyder was still competent to waive counsel, and the court was entitled to credit that finding.[8]

More to the point, nothing that followed the second *Faretta* hearing gave the court "reasonable cause" to second-guess the magistrate judge's finding. 18 U.S.C. § 4241(a). On the contrary, the court's "own observations" of Snyder not only led it to conclude that he was "competent, albeit foolish, to represent [himself]." *Johnson*, 610 F.3d at 1142, 1145. It also led the court to believe that Snyder's trial performance was in fact "tactical," J.A.1371; "intentional," J.A.1160; J.A.1193; J.A.2468, J.A.2495-2496; and "deliberate," J.A.1803—not the product of mental

---

[8] For this same reason, Snyder's insistence (Br. 11, 18, 20) that the court never "ma[d]e further inquiry" into his alleged mental ailments is wrong. Obviously it did: It sent Snyder back to the magistrate judge for a second *Faretta* hearing. On a related note, all but two of the cognitive "problems" that Snyder cites (Br. 21-23) came *before* the second *Faretta* hearing, and Snyder seldom raised health issues during trial. *See* J.A.1962; J.A.2204; J.A.2521-2522. At any rate, none of Snyder's supposed difficulties—whether before or during trial—gave the court reasonable cause to revoke his waiver of counsel. If anything, they contributed to the court's conclusion that Snyder's in-court performances were manipulative—either as attempts to gain sympathy, obtain delay, or excuse his ignorance of courtroom rules.

incapacity.   *See* J.A.2115; J.A.2520; J.A.2581, J.A.2595; JA.3476.   While Snyder

now disputes these beliefs—claiming that he was not acting purposefully but was so

mentally ill that it led to misbehavior, Br. 26-27—he ignores the considerable def-

erence that a district court's "first-hand" judgments are owed, *Bernard*, 708 F.3d at

593.   "[D]istrict courts are in the best position to make competency determinations"

because they have a superior vantage point from which "to observe [a defendant's]

demeanor and make judgments about his mental abilities," often through repeated

interactions over many months or years.   *Id.* at 591, 593.   This front-row perspec-

tive is all the more valuable when a "district court view[s] [the defendant's] behavior

as reflective" of a particular "trial strategy," one that this Court might otherwise risk

"validat[ing]."   *United States v. Banks*, 482 F.3d 733, 743 (4th Cir. 2007).   And in

Snyder's case, drawing from multiple pretrial hearings, pro se filings, and nine days

of trial, the court saw no reason to revisit Snyder's choice to represent himself.   *See*

*also* J.A.1036; J.A.1071; J.A.1087.   "We defer" to this "superior position."   *Banks*,

482 F.3d at 743.

　　　All this being so, the court made no error, much less a plain one, in declining

to rescind Snyder's competent waiver of counsel.   Even when a "defense is almost

certain to fail, the Sixth Amendment protects the right of defendants to go down in

flames if they wish."   *United States v. Jones*, 65 F.4th 926, 931 (7th Cir. 2023)

(cleaned up).   And while Snyder obviously regrets his choice, self-representation "cannot be denied" just because he turned out to be "a poor advocate at trial," *Berry*, 565 F.3d at 391—especially since he was told, time and again, that this would be the likely result, J.A.3496.   His regret offers no basis for this Court's intervention now.

## II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DE-CLINING TO INSTRUCT THE JURY ON THE ADVICE-OF-COUN-SEL DEFENSE

### A.   Standard of Review

A district court's decision to withhold a defense in a jury instruction is re-viewed for abuse of discretion.   *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012), *superseded by regulation as stated in United States v. Shareef*, 852 F. App'x 92, 95 (4th Cir. 2021).   This standard "recognizes the superior position of the district court to evaluate evidence and formulate the jury instruction," and ac-cordingly demands "defer[ence] to a district court's decision."   *United States v. Gray*, 47 F.3d 1359, 1368 (4th Cir. 1995).

### B.   The Advice-of-Counsel Instruction Lacked an Evidentiary Foun-dation

The district court acted well within its discretion in declining to instruct the jury on the advice-of-counsel defense.   "As a general proposition a defendant is en-titled to an instruction as to any recognized defense … [if] there exists" an eviden-tiary foundation for it, meaning "evidence sufficient for a reasonable jury to find in

29

his favor.'" *United States v. Cousar*, 539 F. App'x 83, 85 (4th Cir. 2013) (per curiam) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).   In the advice-of-counsel context, this means that "'the *defendant* must establish'" the two elements of that defense before he is entitled to an instruction on it: "'(a) full disclosure of all pertinent facts to an attorney, and (b) good faith reliance on the attorney's advice.'" *United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015) (quoting *Powell*, 680 F.3d at 356).   "If the defendant can[not] point to evidence … [of] both" these elements, an advice-of-counsel instruction is not appropriate.   *Shareef*, 852 F. App'x at 95.   And even if he can, a court's refusal "to provide a proffered jury instruction" is not "reversible error" unless it "seriously impair[s] the defendant's ability to conduct his defense."   *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010) (cleaned up).

**1.**   Snyder stumbles at the first step here:   He identifies no evidence from which to conclude that he "full[y]" disclosed "all pertinent facts" to his attorneys. *Powell*, 680 F.3d at 356.   In fact, the record betrays the opposite.   Andy Graham, Eric Yaffe, and John McNutt all testified that they "didn't know much" about what Snyder was doing beyond the "general," "hardly novel" concept of a consulting or retainer agreement.   J.A.299; *see* J.A.1342-1347; J.A.1355; J.A.1432-1433, J.A.1457-1459.   They certainly did not know the most "pertinent" fact of all to the

30

extortion question, *Powell*, 680 F.3d at 356, namely, *how* Synder was planning to secure the agreement—whether, for example, by promising to perform real work with actual, tangible benefits (legal), or instead by threatening to launch a press campaign designed to bring UMMS and its employees economic and reputational ruin if he did not receive a large, long-term contract that would buy his silence (extortion).

On the contrary, Graham repeatedly told Natalie Magdeburger that he had "no specifics" on how the consultancy proposal materialized or what the parties had discussed.   J.A.300; *see* J.A.300 ("I don't know any specifics, really."); J.A.301 ("I don't have enough detail to, you know, sign off, particularly meaningfully, except to say that retainer agreements are done all the time."); J.A.301 ("I don't know any details."); J.A.304 ("I don't really have any details at all."); J.A.315 ("I don't have all the details.").   Until Magdeburger informed him otherwise, Graham "d[id]n't even know who suggested … [the consultancy] in the first place," thinking it possible that "Maryland did."   J.A.305.   Yaffe testified similarly at trial, stating that Snyder "initially told me that it was the hospital who brought up the consultancy agreement."   J.A.1345-1346.   It was not until Snyder "hedged" after Yaffe "asked [him] … who made the initial suggestion" that Yaffe surmised he had been misled. J.A.1346.   As for McNutt, his "assignment was very limited.   If Mr. Synder

31

pursues a consulting agreement with the hospital, can he do that without disclosing that to his client, and my recommendation was no, you cannot do that."   J.A.1355-1356.

None of this paints a picture of full or relevant disclosure.   At best, it suggests that Snyder sought advice on whether a consultancy could be done (yes, so long as Snyder gave legal consideration), J.A.307-309; J.A.1427; whether it could be done while he represented Michele Sanders (yes, so long as Sanders consented), J.A.308-309; J.A.2870; whether it could be done without informing Sanders of the details (no), J.A.1343-1344; J.A.2848-2849; J.A.2870; and whether it required splitting the $25 million fee with Sanders (yes), J.A.2848-2849.   The same evidence also suggests that Graham, but not Yaffe or McNutt, might have been aware of some of the proposal's terms, including Snyder's $25 million request, but not until the extortionate meetings had already occurred.   J.A.302-303; J.A.1432-1433.   Either way, not even Graham knew "exactly what service or services [Snyder]'d be providing" for that amount of money.   J.A.300.   And although Graham offered examples of what Snyder could do for UMMS, J.A.299-300, Snyder himself "could not articulate" what his role at the hospital would be, J.A.2854.   Instead, he repeatedly told UMMS representatives that he expected to do little to no work, with the consultancy merely a "cover," "on paper," for the true benefit of the $25 million: to conflict him out of

32

future cases and buy his silence in the process.    J.A.103-104, J.A.111; *see* J.A.82-83, J.A.109; J.A.1874; J.A.2853.

But even this misses the bigger point.    *Contra* Br. 33.    What Snyder's attorneys knew about the agreement's terms, or when they came to find out about them, are questions that grapple with only half the equation: whether Snyder "received the advice of counsel on the legitimacy of the end sought," the consultancy.    *United States v. Traitz*, 871 F.2d 368, 382 (3d Cir. 1989).    Again, they say nothing about whether Snyder sought advice on "the means used to obtain" that end, which is an equally "material fact[]" to extortion.    *Id.*    "It was only through disclosure of both the means and the ends that counsel could properly evaluate the potential legality" of Snyder's actions.    *Id.* at 382-383.    Yet Snyder points to zero evidence that Graham, Yaffe, or McNutt were aware that Snyder intended to obtain the consultancy by threatening the hospital with a negative media blitz, even if UMMS settled Sanders's case.[9]    He certainly points to no evidence that they approved of such tactics.

---

[9]    In a footnote, Snyder argues that an email never admitted at trial, in which Graham advised Snyder to meet with UMMS about "major ramifications" of Sanders's case, supports his assertion that Graham knew about his tactics.    Br. 33 n.7. But even if it were admitted, the email hurts Snyder, not helps him.    It shows that Graham had no idea that Snyder had already gone miles beyond threats of incidental "ramifications" from lawsuits and had instead planned attack ads, press conferences, and Internet bombs calculated to "destroy" the hospital.    J.A.2852.

Worse for Snyder, the email betrays Graham's belief that Snyder's demands were linked to his client's case—but certainly by June 2018, that was not true.    Even

Quite the reverse:  When asked whether they "advised Mr. Snyder that he could seek his consultancy by threatening to destroy" UMMS, his lawyers answered with an unequivocal "no."   J.A.1336; *see* J.A.1433.[10]   That ends the inquiry here.

**2.**   As for Snyder's remaining arguments on appeal, neither moves the needle.  He first insists that the court "acted as if it were the final arbiter of fact" in declining to give the advice-of-counsel defense, which should have been "heard by the Jury."  Br. 31.   But the court did not act as "the final arbiter of fact," *id.*; it acted in accordance with this Court's clear-cut rule that "'the *defendant*'" must "produce evidence supporting the advice-of-counsel defense" before a jury gets to hear it, *Westbrooks*, 780 F.3d at 596 (quoting *Powell*, 680 F.3d at 356).   Snyder produced no such evidence.   He laid no "evidentiary foundation" at all, judged even under a prima facie standard, that would have allowed a jury to find that he "full[y] disclos[ed] all pertinent facts" about the consultancy to his lawyers.   *Id.* (cleaned up).

---

"if you settle her case," Snyder told UMMS, "that doesn't preclude me … going forward."   J.A.104; *see* J.A.105 ("[S]ettling her case, without settling what I know, doesn't do the hospital any good."); J.A.126 ("Please don't think you can settle with her and I wouldn't do it[.]"); J.A.224 ("[S]ettling with her doesn't make me go away[.]"); J.A.228 ("[P]lease don't think … you can settle her case and I won't do this.").

[10]   Snyder criticizes this examination as a "leading 'gotcha'" that "deserve[s] no weight."   Br. 34-35 n.8.   But of course it deserves weight.   When the question is whether Snyder's attorneys knew of "both the means and the ends" involved in his pursuit of a consulting agreement, the attorneys' answers on this front are all but dispositive.   *Traitz*, 871 F.2d at 382-383.

34

This is true on both the "ends" and "means" sides of the equation. On the "ends" side, Snyder did not tell his lawyers (as he told UMMS) that he had no intention of becoming a bona fide consultant for the hospital, or doing any of the things that Graham suggested he could do, and instead demanded the $25 million as a payoff for his silence. *See* J.A.1458 (Graham's "expectation was that Mr. Snyder would earn the money"); *see also* J.A.212-214 (Snyder proposing to scrap consultancy altogether in favor of "one payment"). These are necessary disclosures before a lawyer can "properly evaluate" a contract's "legality." *Traitz*, 871 F.2d at 382; *see United States v. Avenatti*, 81 F.4th 171, 189-191 (2d Cir. 2023). And on the "means" side, the lack of even a whiff that Snyder's lawyers knew about his extortionate tactics needs no retelling. Suffice it to say, the court was not wrong to conclude that Snyder had "certainly" introduced "no evidence that Mr. Graham blessed what Mr. Snyder … did during the meetings." J.A.2388.

In addition, Snyder argues that he deserved an advice-of-counsel instruction because he "repeatedly attempted to have Graham attend at least one meeting with UMMS," which "suggest[s] that Snyder was being completely transparent about his conduct." Br. 32. That leap of faith is not warranted. For one thing, the timing is off. Snyder did not propose a meeting between UMMS and Graham until after his extortionate conduct had already occurred. *See* J.A.228; J.A.1311. Graham's

35

last-minute involvement would not have absolved Snyder of his earlier actions.

More to the point, the mere fact of Graham's invitation to this eleventh-hour meeting does not "demonstrate[] that [he] was firmly in the loop" at any point beforehand.  Br. 33.  His prospective stamp of approval on an agreement that he had no part in negotiating says nothing about his knowledge of how those negotiations unfolded.  Meanwhile, the actual trial evidence—as opposed to the counterfactual hypothesizing that Snyder invites—says a lot about Graham's (lack of) knowledge. It also says a lot about Snyder's use of Graham's reputation to lull UMMS into accepting the legitimacy of the consultancy, while Graham himself was kept out of the process until Snyder's message to UMMS had time to sink in.   No part of this legerdemain provided a sufficient "evidentiary foundation" to entitle Snyder to an advice-of-counsel instruction.  *Powell*, 680 F.3d at 356.

**3.**   In any event, any error declining to submit the advice-of-counsel defense to the jury was harmless.   This is because the court's "failure to give the requested instruction" did not "seriously impair[] [Snyder's] ability to conduct his defense." *Lighty*, 616 F.3d at 366 (cleaned up).   Rather, as the court explained, Snyder was fully permitted to argue "that he did not have the requisite intent to commit attempted extortion by virtue of the fact that he reached out to lawyers."   J.A.2389; *see* J.A.2384; J.A.2468.   His pursuit of "this theory was in no way affected by the

36

court's refusal to provide the requested [advice-of-counsel] instruction." *Cousar*, 539 F. App'x at 86.

And pursue this theory he did. At least six different times during his closing argument, Snyder contended that he sought advice on the consultancy and invited UMMS representatives to speak to his attorneys. J.A.2475-2476; J.A.2480-2481; J.A.2481-2482; J.A.2486; J.A.2491-2492; J.A.2501. He argued that this meant he lacked "criminal intent," J.A.2475—in other words, that his attempt to "get the appropriate advice" from his attorneys negated the mens rea element of extortion, J.A.2491. True, the jury did not buy Snyder's argument, but that does not mean he was unable to present the kind of "full defense to the allegations against [him]" that he now claims was missing. Br. 28; *see also United States v. Householder*, 137 F.4th 454, 487 (6th Cir. 2025) (the advice-of-counsel defense is a lack-of-intent defense, described as when "defendant says he didn't have the intent to do the unlawful act because he followed the advice of counsel"). Because the jury heard and considered that defense (but rejected it anyway), the outcome of his case was "not substantially swayed" by the absence of a more specific advice-of-counsel instruction. *United States v. Nsahlai*, 121 F.4th 1052, 1060 (4th Cir. 2024) (cleaned up).

37

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN IM-POSING LIMITATIONS ON SNYDER'S QUESTIONING OF SAND-ERS

### A.  Standard of Review

Whether a district court improperly limited a defendant's right to present tes-timony is reviewed for abuse of discretion, "considering whether the district court acted in an arbitrary fashion, or restricted the defendant's [presentation of] testimony to a degree not warranted by the demands of evidentiary and trial management." *United States v. Woods*, 710 F.3d 195, 200 (4th Cir. 2013).

### B.  The Court's Limitations on Snyder's Examination Were Reasona-ble

The district court acted well within its discretion in limiting Snyder's exami-nation of his former client, Michele Sanders, to accommodate Sanders's nondisclo-sure agreement with UMMS.  That agreement, as Sanders's counsel explained at trial, protected the contracting parties' privacy interests by barring Sanders from dis-cussing the underlying facts of her malpractice claim.  J.A.2102-2106.  It did not "prevent [Sanders] from testifying about the consultancy," J.A.2102; *see* J.A.5148, which was his chief purpose in calling her.  *See* J.A.545, J.A.578; J.A.2105.  Nor did it prevent the court from compelling Sanders's testimony on otherwise confiden-tial subjects if the court deemed that testimony relevant or noncumulative, J.A.2104, which the court did at least twice, J.A.2155, J.A.2168.  All in all, the court cited

38

Sanders's nondisclosure agreement as a reason for limiting her testimony no more than a dozen times.   J.A.2145-2146, J.A.2154-2155, J.A.2173, J.A.2176, J.A.2180, J.A.2185, J.A.2187, J.A.2188, J.A.2189.   As for the 300-plus other questions that Snyder asked of Sanders, the court let Sanders answer, sustained a Government objection, or asked Snyder to rephrase his (typically leading) question.

1.   These minimal restrictions on Sanders's testimony did not amount to an abuse of discretion.   "On the contrary, trial judges retain wide latitude … to impose reasonable limits" on the examination of witnesses.   *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).   This is notwithstanding a defendant's "right to present relevant testimony," which may yield to "other legitimate interests" when the circumstances call for it.   *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (cleaned up).   So long as the restrictions designed to serve those interests are not "arbitrary or disproportionate," *id.*, they fall within the court's "broad latitude in this realm," *United States v. Beckton*, 740 F.3d 303, 306 (4th Cir. 2014).   "All that is required in other words is that any limitation" be "reasonable," lest "every restriction on questioning … turn into a mini-constitutional inquiry."   *Batey v. Haas*, 573 F. App'x 590, 594 (6th Cir. 2014).

So it is here.   The court's limitations on Snyder's examination of Sanders reflected a reasonable balance of the considerations at play.   Those considerations

39

included not only UMMS's and Sanders's shared interest in enforcing their contrac-
tual rights—a legitimate interest that by itself warranted restricting Snyder's ques-
tioning, unless Snyder could overcome that interest by showing a need for the testi-
mony (usually he could not).   *See* J.A.2105 (court explaining that "without more"
about why testimony was "relevant," "I will not order [Sanders] to otherwise violate
the nondisclosure"); *see also Batey*, 573 F. App'x at 593 (upholding restrictions on
questioning based on state-provided privacy rights for rape victims); *Baker v. Gold-
man Sachs & Co.*, 669 F.3d 105, 111 (2d Cir. 2012) (upholding restrictions on ques-
tioning based on state-provided privilege for journalists).

More routinely, they also included considerations born from "the demands of
evidentiary and trial management," *Woods*, 710 F.3d at 200, especially the potential
for "interrogation that [was] repetitive or only marginally relevant," *Van Arsdall*,
475 U.S. at 679.   This was of particular concern in Snyder's case given his penchant
for discursive questioning, of which the court was well aware by the seventh day of
trial.   And that concern was clear from the court's rulings even when it cited the
nondisclosure agreement as a reason for limiting Snyder's interrogation.   In fact,
the majority of times the court did so, it explained that Snyder's questions were also
inappropriate because they were collateral, cumulative, or lacked foundation any-
way.   *See* J.A.2105-2107 (questions about details of malpractice irrelevant);

40

J.A.2146, J.A.2183 (questions about Sanders's UMMS research irrelevant); J.A.2154-2156 (questions about wrongful-death cap cumulative and lacking foundation); J.A.2173 (questions about initial demand amount irrelevant and cumulative); J.A.2176-2180 (questions about details of Sanders-Bartlett meeting irrelevant, although questions about why Sanders wanted the meeting permissible); J.A.2188-2189 (questions about why doctors left UMMS irrelevant, although questions about fact that doctors left permissible).

The upshot is that the court did not restrict Snyder's examination just because of "secondary" "state-law contractual concerns," as Snyder now insists.   Br. 40, 43. It imposed limitations because Snyder could not show why the testimony he sought was relevant, let alone sufficiently relevant or noncumulative to warrant denying the contracting parties the benefits of their bargain.   *See United States v. Ferris*, 704 F. App'x 225, 235 (4th Cir. 2017) (cleaned up) (no abuse of discretion "when [defendant] was able to introduce this exact testimony through other, proper lines of questions"); *Woods*, 710 F.3d at 201 (similar).

And the court was right about that.   None of the alleged "purposes" that Sanders's testimony would have served, Br. 41, was relevant to his defense or left undeveloped at trial.   His "contention that UMMS had engaged in widespread misconduct," *id.*, was amply explored through the testimonies of Jesse Schould, J.A.2227-

41

2229, J.A.2236-2245, and Antonio DiCarlo, J.A.2323-2328, whom Snyder hired to prepare reports on that subject, as well as by his expert Jonathan Schraub, J.A.2014-2015, J.A.2018-J.A.2022.   The notion that "Sanders could have explained why she gave Snyder a mandate to take on a consultancy," Br. 41, ignores that Sanders did explain this—twice.   *See* J.A.2159, J.A.2162.   (It also ignores Sanders's bombshell revelation that once she found out what the consultancy entailed, she told Snyder that she "would never speak to [him] again" if he went through with it.   J.A.2197.) And the idea that Sanders "could have established that Snyder's efforts at obtaining a consultancy were not wrongful" misunderstands the wrongfulness inquiry here, which turns not on whether "Snyder legitimately believed there existed systemic problems" at UMMS, Br. 41, but on whether he "had a claim of right to the money demanded," *Avenatti*, 81 F.4th at 184 (cleaned up).   He did not.   Snyder's beliefs were irrelevant to "any plausible claim of right to be hired by" UMMS to perform unwanted and undefined services, much less to demand a $25 million payment separate from his client and apparently misaligned with her interests.   *Id.*; *see* J.A.123-124 ("I'm the guy that has really, and – and truthfully, not provided undivided loyal to her. … If, in fact, I was providing undivided loyalty to her, I would have filed this claim a long time ago.").

42

**2.**   As for Snyder's other objections to the court's restrictions on his interrogation, none persuades.   He first argues "the court never seemed to acknowledge that the [nondisclosure agreement] … permitted [Sanders] to make disclosures pursuant to a court order."   Br. 40.   But in fact, the court did acknowledge this. J.A.2104-2105.   And it relied on the let-out clause multiple times over the objection of Sanders's counsel—twice to compel Sanders to answer Snyder's questions, J.A.2155, J.A.2168, and once to give an advisement to the jury, J.A.2161-2152. The court's use of this authority only confirms that its limitations on Snyder's examination were less about the nondisclosure agreement than they were about regular evidentiary concerns.

Snyder next insists that the court neglected to "weigh[] Sanders' state-law contractual concerns against Snyder's competing constitutional right," and it "would have been one-sided" had the court done so.   Br. 40.   As just discussed, Snyder's premise is wrong: "contractual concerns" were not the only or primary rationale for limiting Snyder's testimony, *id.*, as opposed to other "legitimate interests in the criminal trial process," *Michigan v. Lucas*, 500 U.S. 145, 149 (1991)—like the relevance of Snyder's questions, the extent to which Sanders's testimony would be cumulative, the potential to distract the jury with collateral issues about the transplant program, and so on.   No doubt, the court appropriately balanced these interests against

43

Snyder's right to present a defense, eschewing a blanket ruling in favor of resolving on a question-by-question basis whether it was likely to lead to probative testimony.

But even on its own terms, Snyder's contention fails. Sanders, UMMS, and the state of Maryland share a legitimate interest in enforcing this lawful contract. *See* J.A.2103. And "so long as there exists a 'valid state justification,'" a trial court may "even exclude" evidence if it is "'central to the defendant's claim of innocence.'" *Gagne v. Booker*, 680 F.3d 493, 516 (6th Cir. 2012) (cleaned up) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Of course, the court did not exclude any such evidence here, despite the "valid state justification" in honoring the parties' rights under state law. *Crane*, 476 U.S. at 690. If at all, it excluded evidence of minimal-to-no probative value, and only after giving Snyder a chance in numerous sidebars to show why the testimony he sought was appropriate. This approach was not "disproportionate to [the] legitimate concerns" raised during trial. *Woods*, 710 F.3d at 201. And the fact that Snyder "proffer[ed] relevance" at least once with success, J.A.2177—after explaining to the court that questions about why Sanders wanted to meet with Stephen Bartlett were relevant because the meeting, like the consultancy, was a condition of her settlement, J.A.2176-2179—only proves that the court engaged in the careful balancing that Snyder claims was missing.

44

Lastly, Snyder doubles down on his argument that "Sanders' testimony was particularly critical"—and its exclusion particularly calamitous—because it would have shown not only that he pursued the consultancy at Sanders's behest, but that his "understanding of problems at the transplant department … justified his warnings to the hospital about the consequences it could face if her case did not settle."   Br. 37.   This argument suffers from numerous flaws.   For one thing, as already explained, Sanders's testimony was not critical to these points, which were both liberally aired by other witnesses.   For another, as also previously explained, Snyder's "understanding of problems" is irrelevant to whether he acted wrongfully, Br. 47, since his beliefs—legitimately held or no—did not entitle him to a $25 million "consulting" arrangement that apparently contemplated no real work.

Most problematically of all, Snyder's argument distorts the record.   Nothing but Snyder's own improper testifying during his various examinations suggests that the consultancy was Sanders's idea, as opposed to an idea that she got on board with.   *See* J.A.2152-2153.   And even if it had been Sanders's brainchild, her testimony makes plain that she had a very different impression of what a consultancy meant than Snyder did.   J.A.2159, J.A.2162.   In fact, when Sanders discovered that it put Snyder "on [UMMS's] side," she told him that "if you ever did that I would never speak to you again."   J.A.2197.   Moreover, Snyder told UMMS representatives at

45

least a half-dozen times that the consultancy was *not* "part-and-parcel of Sanders'
settlement," Br. 37, but "separate" from it, J.A.95, J.A.100, J.A.104-105—and that
settling Sanders's case would "not prevent [him] from going forward" with a public
relations campaign, J.A.126.   Properly understood, then, the record does not sup-
port Snyder's claim that the consultancy was tied to Sanders or the pursuit of her
interests.   And it certainly does not suggest that had the court placed no limitations
on his interrogation of her, Sanders's testimony would have rehabilitated his de-
fense.

     **3.**   Even if the court abused its discretion in limiting Snyder's examination of
Sanders (it did not), the error was harmless.   This is true for many of the same rea-
sons already covered, including the plentiful evidence traversing the "same ground"
that Sanders supposedly would have tread.   *United States v. Brant*, 188 F.3d 503,
*1-2 (4th Cir. 1999) (per curiam) (table).   They also include the fact that some of
the testimony Snyder sought of Sanders was actually irrelevant to his defense and
would not have established his claim of right to a $25 million personal payment.
*See Dorman v. Annapolis OB-GYN Assocs., P.A.*, 781 F. App'x 136, 146 (4th Cir.
2019) (excluding testimony that "did not concern the central issue" and lacked "rel-
evance" was harmless).   This is to say nothing of the powerful evidence of Snyder's
guilt even without Sanders's testimony, including the recording of his last meeting

with UMMS—which proved damning, on its own, to any claim that his demands were connected to his client.   In short, the outcome of Snyder's case was unaffected by the limitations on his interrogation of Sanders.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO QUESTION THE JURY ABOUT A MIDTRIAL NEWSCAST

### A.   Standard of Review

A district court's decision not to interrogate the jury about a news article appearing during trial is reviewed for abuse of discretion.   *Jones v. Wellham*, 104 F.3d 620, 629 (4th Cir. 1997); *United States v. Jones*, 542 F.2d 186, 194 (4th Cir. 1976). Under this deferential standard, the Court "may not substitute [its] judgment for that of the district court" and "may only find" an abuse of discretion "when the district judge is fundamentally wrong."   *United States v. Burleigh*, 145 F.4th 541, 548-549 (4th Cir. 2025) (cleaned up).

### B.   There Was No Substantial Reason to Fear Prejudice From the Contempt-Related Newscast

The district court properly exercised its discretion in declining to question the jury about a "newscast" released after the penultimate day of trial, in which the reporter allegedly discussed the court's contempt finding against Snyder.   J.A.2529.[11]

---

[11]   Snyder did not offer more than a high-level, half-sentence description of the newscast in question and appears not to have seen it himself.   J.A.2529.   Nor is

47

While Snyder argues this decision deprived him of an impartial jury, "not … every newspaper article appearing during trial requires" a district court to poll the jurors about it. *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974). The court need only "raise the question with the jurors" if, "under the totality of circumstances[,] there is a 'substantial reason to fear prejudice'" from the article's release. *Wellham*, 104 F.3d at 629 (quoting *Hankish*, 502 F.2d at 77). "And, whether there is such a 'substantial reason,' hence a necessity to make inquiry, is committed in the first instance to the district court's informed discretion." *Id.*

**1.** The court here found no reason to "make inquiry" as to whether any juror had seen the newscast. *Id.* And its three-part explanation for so ruling falls comfortably within "the scope of … judicial discretion" to which this Court has historically "accord[ed] deference." *Jones*, 542 F.2d at 194-195 (cleaned up).

*First*, the court reasoned that it had "admonished the jury … at least once a day, probably twice a day," to "not research the case." J.A.2532. It also observed that its formal instructions, both preliminary (J.A.894-895) and at the close of evidence (J.A.2401-2402), included "an instruction on publicity," J.A.2532. A review of the record bears out these assertions. On 13 separate occasions the court told the

---

there any information about the newscast online, or indeed, any evidence that it aired.

jurors that they could not conduct any outside investigation.     J.A.842-843; J.A.894-896;   J.A.1070;   J.A.1356;   J.A.1589;   J.A.1849;   J.A.2082;   J.A.2230;   J.A.2264; J.A.2401-2402; J.A.2514; J.A.2535.     Thrice it ordered the jurors to alert the court "[i]f you see or hear anything that you should not" or "see or hear that someone else is saying or doing something that breaks these rules."     J.A.843; *see* J.A.896; J.A.2123.     Thrice also it warned the jury that "[a]nything you may have seen or heard outside the courtroom is not evidence and must be disregarded."     J.A.891; *see* J.A.2402; J.A.2405-2406; *see also* J.A.894 ("[J]urors must decide this case based solely on the evidence presented here []in … this courtroom."); J.A.895 (similar); J.A.2399 (similar).     On top of that, the court's voir dire specifically asked whether prospective jurors would be able to obey an instruction "that they may not research anything about the case … [and] must avoid any reports or information about the case or the trial in the media."     J.A.20 (ECF No. 251).     Presumably, anyone who answered "no" was not on the jury to begin with.

These admonitions were plenty enough to "deal[] with the problem" of the contempt-related newscast.     *United States v. Grande*, 620 F.3d 1026, 1031 (4th Cir. 1980).     A jury that is presumed to follow the directives given it, *United States v. Brewbaker*, 87 F.4th 563, 583-584 (4th Cir. 2023), would know to avoid media publicity about Snyder's trial; to let the court know if anyone, by chance, stumbled upon

it; and to disregard what he might have seen in any event.   This presumption holds particularly strong in Snyder's case given the sheer number of instructions on this topic, from the daily (or twice-daily) reminders not to look into or discuss the trial, to the court's repeated orders to set aside anything the jury heard outside the court-room.   Mindful of these plenary instructions, the court had no reason to believe, much less a "substantial reason to fear," that any juror would find, then sit through, then remain silent about, and then ultimately fail to disregard what he heard in the newscast.   *Wellham*, 104 F.3d at 629 (cleaned up); *cf. Grande*, 620 F.3d at 1031 (no abuse of discretion in declining to poll jury when judge "repeatedly admonished" jurors "not to read anything about [the case]" and "repeatedly told them to come to him and tell him if they had read or been influenced by any outside publicity").

*Second*, the court explained that it would deny Synder's request to interrogate the jury because "there's no indication … that they have read the news or that [it] would influence their deliberations."   J.A.2532.   This assertion, too, is borne out by the record.   Despite the judge's orders to alert her if any juror had seen or shared outside publicity, no juror did.   Nothing at trial otherwise suggested the court's di-rectives were being disobeyed, or that any juror was incapable of doing so.   *Cf. Wellham*, 104 F.3d at 629 (no abuse of discretion given "no indication … that those admonitions were not being obeyed").   This fact is especially significant given the

50

handful of other news reports appearing daily during Synder's trial, including reports favorable to Snyder.[12]   The court was not wrong to believe that the same jurors who presumptively avoided those reports over the last seven days of trial would start to consume them abruptly on the eighth, just in time for the contempt-related newscast.

*Finally*, the court concluded that polling the jury was not only unnecessary given its countervailing directives, but "would draw more attention" to the contempt finding against Snyder, spreading taint where none exists.   J.A.2532.   This is a legitimate concern.   And it has been recognized by this Court as a "risk which district courts must factor into their discretionary determination" on whether to question a jury.   *Wellham*, 104 F.3d at 629; *see Jones*, 542 F.2d at 196-197 (no abuse of discretion given court's "fear that, to interrogate the jury … about the threatening headline, would have aggravated the problem").   That risk ran particularly high in Snyder's case:   Jurors who had been told routinely to stay shy of publicity would surely wonder why they were being specially interrogated about it at the end of trial. And while Snyder now complains that an interrogation could have been done delicately, the temporal spin he suggested below—to ask about news in the last three

---

[12]   Although Snyder's description of the "extraordinary," "pervasive[]," and "prominent[]" media interest makes it seem as though Baltimore was flooded with sensational journalism, the actual pace and prominence of exposure seemed much tamer.   Br. 47; *cf. Wellham*, 104 F.3d at 629 (no abuse of discretion when articles "were not prominently featured as headline items or in sensational terms").

days, not just one day—would have done little to abate the court's concern.  Any questioning at that point would have risked revealing "the existence of possibly prejudicial publicity about which no juror may have been aware … or, if already revealed, ascrib[ing] a greater significance than its contents actually warranted." *Wellham*, 104 F.3d at 629.

**2.**  Snyder throws a few other jabs at the court's ruling, but none lands.   He first criticizes the court for relying on admonitions that did not "foreclose the possibility that any of the[] [jurors] were exposed to news accounts" accidentally, as opposed to through deliberate research.   Br. 45.   This criticism takes the admonitions too literally, and mistakenly assumes the jury did the same.   But no juror who is told to avoid "investigat[ing] anything or anyone connected to the case," J.A.1070, is likely to think that he can*not* trawl for news reports but *can* sit through a newscast. Snyder's criticism also takes the admonitions in isolation, ignoring the half-dozen times the court instructed the jurors more broadly—to resist "obtain[ing]," "find[ing] out," "access[ing]," or "learn[ing] more" information "from any outside source." J.A.894-895; J.A.2401-2402; J.A.2535.   These directives are exactly the kind of admonitions that have "warranted the district court's discretionary decision" to decline to poll the jury.   *Wellham*, 104 F.3d at 629; *see Grande*, 620 F.2d at 1031.

52

Snyder also insists that the court wrongly relied on the lack of "indication that any juror had read or would be influenced by the news," because the "only way" the court could have known that "was to ask." Br. 46. Not so. The judge explicitly told the jurors to let her know if they or another panel member saw or heard "anything that [they] should not," J.A.843, and reiterated this order again, J.A.896, and again, J.A.2123. No juror ever did so alert the court, either before or after the contempt-related newscast. This was notwithstanding that only hours before the newscast aired, the court had given its most fulsome publicity instruction yet, J.A.2401-2402, J.A.2405-2406, leaving the topic fresh in the jurors' minds. It was also notwithstanding the jury's opportunity to do so the morning after, when the court summoned the jurors for final instructions—instructions that yet again "remind[ed]" them of their obligation to avoid "using any source whatsoever to learn more about this case." J.A.2535. Certainly by then, the court was more than justified in believing the jury had stuck to its oath. *See also Gov't of Virgin Islands v. Dowling*, 814 F.2d 134, 137 (3d Cir. 1987) ("[T]he trial judge develops a relationship with the jury during the course of trial that places him in a far better position than an appellate court to measure what a given situation requires.").

Lastly, Snyder argues that the court's ruling "precluded [him] from establishing any potential prejudice." Br. 46. This argument at least acknowledges Snyder's

53

burden before he is entitled to the "drastic relief" of "a new trial." *United States v. Promise*, 255 F.3d 150, 194 (4th Cir. 2001) (Motz, J., concurring).    But it focuses on only half of the inquiry, which is not limited to whether the newscast contained prejudicial material—a debatable premise in Snyder's case anyway.    *Compare*, *e.g.*, *MidAtl. Int'l Inc. v. AGC Flat Grass N. Am., Inc.*, 594 F. App'x 105, 108 (4th Cir. 2014) (per curiam) (no prejudice from holding defense counsel "in contempt in the presence of the jury" because the court "explain[ed] several times that its remarks and rebukes were not an indication of its support for either side"), *with* J.A.2397-2398 (instructing jury that "[t]he rulings I have made during the trial are not any indication of my views" and "[y]ou are expressly to understand that the Court has no opinion as to the verdict").[13]    Rather, the question is whether the jury's verdict was influenced by that purportedly prejudicial material.    It was not—nor was there

---

[13] *See also United States v. Williams*, 809 F.2d 1072, 1089-1090 (5th Cir. 1987) (no prejudice from finding "contempt[] in front of the jury" because "there is no *per se* rule requiring reversal for such an act," and the court "minimized the potential for misunderstanding" with curative instructions); *United States v. Hawley*, 768 F.2d 249, 252 (8th Cir. 1985) (no prejudice from "having the defendant's attorney arrested, in the presence of the jury, for contempt" because the evidence of defendant's guilt was "overwhelming"); *United States v. Jackson*, 627 F.2d 1198, 1206 n.18 (D.C. Cir. 1980) (no prejudice from rebuking counsel in jury's presence because "jury was aware that the defense counsel was disregarding" rulings; "[i]n context," the rebuke was meant "to ensure adherence to his rulings, not [relay] his views of the evidence"; and judges have an "obligation to protect the respect due their position lest they lose their necessary stature with the jury").

a "substantial reason to fear" that it would be.  *Wellham*, 104 F.3d at 629.   The court's admonitions and instructions amply guarded against the possibility that any juror had seen or was unable to set aside the newscast, while at the same time averting the "countervailing prejudice [of] revealing the publicity's existence." *Id.*  Because the court's "opinion in this regard was certainly prudent," *Jones*, 542 F.2d at 197, it cannot have been an abuse of discretion.

**3.**   Regardless, and for many of the same reasons, any error in the court's refusal to poll the jurors about the contempt-related newscast was harmless.   Nothing in the record remotely suggests that any juror saw the newscast.   The court's many directives to the jurors to disregard anything they might have seen were more than enough to cure any uncertainty that the newscast contributed to the jury's guilty verdict, assuming anyone had seen it.   *Cf. Williams*, 809 F.2d at 1089-1090.   And even if those directives were not enough to show harmlessness, the "overwhelming" evidence of Snyder's guilt certainly was.   *Hawley*, 768 F.2d at 252.   Snyder's convictions must stand.

## CONCLUSION

For the reasons stated, this Court should affirm Snyder's convictions.

Kelly O. Hayes
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

/s/ M.J. Kirsch Muñoz
Assistant United States Attorney
United States Attorney's Office
6406 Ivy Lane, 8th Floor
Greenbelt, Maryland 20770
(410) 736-8276

December 17, 2025

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS**

This brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,989 words, excluding the parts of the document exempted by Fed. R. App. 32(f).

This brief also complies with the typeface and type-style requirements in Fed. R. P. 23(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ M.J. Kirsch Muñoz
Assistant United States Attorney

57

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 17, 2025, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send notice

of the filing to Snyder's counsel of record, who is an ECF filer.


/s/ M.J. Kirsch Muñoz
Assistant United States Attorney