## CASE NO. 25-4218

## IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

STEPHEN L. SNYDER,

*Defendant - Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

---

## REPLY BRIEF OF APPELLANT
## STEPHEN L. SNYDER

---

C. Justin Brown
Lylian Romero
BROWN LAW
Suite 1000C
233 E. Redwood Street
Baltimore, MD 21202
410-244-5444

*Counsel for Appellant*

## TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................... ii

ARGUMENT ...........................................................................................1

    I.  Under the circumstances of this case, the trial court's failure to revoke Snyder's *pro se* status violated his constitutional rights and constitutes reversible error ................................................................1

    II.  There was a sufficient evidentiary foundation to entitle Snyder to an advice-of-counsel instruction .........................................................11

    III. The trial court's limitation of Michele Sanders's testimony violated Snyder's constitutional rights .......................................................20

CONCLUSION ......................................................................................25

CERTIFICATE OF COMPLIANCE ......................................................27

CERTIFICATE OF SERVICE ...............................................................28

# TABLE OF AUTHORITIES

*Baker v. Goldman-Sachs & Co.*,
  669 F.3d 105 (2nd Cir. 2012)...................................................................23

*Batey v. Haas*,
  573 F. Appx. 590 (6th Cir. 2014)...........................................................22

*Cappetta v. State*,
  204 So.2d 913 (Fla. App. 1967)...............................................................4

*Faretta v. California*,
  422 U.S. 806 (1975) .............................................................................3, 10

*Indiana v. Edwards*,
  554 U.S. 164 (2008) ..............................................................2, 3, 4, 6, 7

*Matthews v. United States*,
  485 U.S. 58 (1988) ...................................................................................17

*Rock v. Arkansas*,
  483 U.S. 44 (1987) ...................................................................................20

*United States v. Bernard*,
  708 F.3d 583 (4th Cir. 2013).....................................................................4

*United States v. Cousar*,
  539 F. Appx. 83 (4th Cir. 2013)...............................................................18

*United States v. Frazier-El*,
  204 F.3d 553 (4th Cir. 2000) ...................................................16, 17, 18, 27

*United States v. Gray*,
  47 F.3d 1359 (4th Cir. 1995) ...................................................................11

*United States v. Hicks*,
  748 F.2d 854 (4th Cir. 1984)...............................................11, 16, 17, 18, 19

*United States v. King*,
  582 F.2d 888 (4th Cir. 1978)......................................................................3

*United States v. Lewis*,
  612 Fed. Appx. 172 (4th Cir. 2015) ..........................................................8

## **ARGUMENT**

I. **Under the circumstances of this case, the trial court's failure to revoke Snyder's *pro se* status violated his constitutional rights and constitutes reversible error.**

The Government fails to address the most important question raised by Snyder: whether he received a fair trial. He did not.

The record in this case establishes that at the time of trial, Snyder was suffering from a combination of a neurodegenerative disorder (Parkinson's combined with Lewy Body dementia) and cognitive impairment. This much should be beyond dispute. The documented symptoms from these conditions – short-term memory loss, disordered thinking, and mental rigidity, among others – gravely interfered with Snyder's ability to represent himself without the assistance of counsel. Although the trial court believed, during the trial, that Snyder was acting intentionally, the impact of his symptoms was the same – they made it impossible for him to represent himself, and he was deprived of a fair trial.

Indeed, after having reviewed Snyder's medical records, the trial court seemed to acknowledge that it had been mistaken, and that Snyder's deteriorating health was at the source of his perceived misconduct. This realization led the court to impose a sentence of probation for Snyder, even as the Government sought three years of incarceration. Under the specific circumstances of this case, allowing

1

Snyder to represent himself, and failing to revoke his *pro se* status, violated his right to a fair trial and his right to counsel, and his convictions must be vacated.

The Government focuses largely on the sufficiency of Snyder's pretrial waiver of counsel and argues that the district court had no duty beyond referring Snyder for a *Faretta* hearing, which the court did. *See* Br. of Appellee at 23 (arguing that the district court "fulfilled its constitutional responsibilities" by twice referring Snyder for a *Faretta* hearing). But there are two errors with this argument. First, Snyder's pretrial waivers of counsel are not dispositive, because both the United States Supreme Court and this Court have already recognized that a court can – and sometimes should – make a defendant proceed with counsel even if he knowingly waives his right to counsel and is competent to stand trial. *See Indiana v. Edwards*, 554 U.S. 164 (2008) (holding that a court may limit the right of a mentally ill defendant to represent himself, even though the defendant is competent to stand trial); *United States v. Frazier-El*, 204 F.3d 553 (4th Cir. 2000) (holding that a court may force a defendant to proceed with counsel even when he knowingly and competently waives his right to counsel).

Second, more than honoring Snyder's constitutional right to represent himself, the trial court had a duty to ensure that Snyder received a fair trial. *See Edwards*, 554 U.S. at 176-77 (noting that honoring a defendant's right to self-representation even when he lacks the capacity to conduct his defense without

2

assistance of counsel "undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial"); *id*. at 177 (recognizing that "proceedings must not only be fair, they must 'appear fair to all who observe them'"). The Government ignores this duty entirely.

Snyder does not dispute that he had two *Faretta* hearings. Nor does he dispute that these hearings reflect a knowing and intelligent waiver of counsel: he knew the charges against him and the possible penalties, and he was advised of the dangers of proceeding without an attorney and how an attorney could be of assistance to him. *See United States v. King*, 582 F.2d 888, 890 (4th Cir. 1978). The Government erroneously suggests that this ends the inquiry. It does not.

The validity of a defendant's waiver of counsel is not dispositive as to the issue Snyder actually raised: that allowing him to proceed *pro se* when he was clearly suffering from mental impairment and lacked the capacity to conduct his defense without the assistance of counsel violated his right to a fair trial and his right to counsel. The Government's brief is silent on this issue. Indeed, the Government does not even dispute the unfairness of the proceedings.

As argued fully in Snyder's opening brief, it is well established that the right to self-representation is not absolute. *See Faretta v. California*, 422 U.S. 806, 834 n.46 (1975); *Edwards*, 554 U.S. at 171; *Frazier-El*, 204 F.3d at 559. Even when a defendant is competent in the legal sense – whether to stand trial or to waive his

3

right to counsel – a court can (and should) deny a defendant's request to proceed *pro se* or revoke his *pro se* status at any point if it becomes apparent that his uncounseled representation will compromise the integrity of the proceedings and impair his right to a fair trial. In other words, the right to a fair trial generally overrides a defendant's right to represent himself.

Indeed, the Supreme Court's concern regarding the defendant's right to a fair trial is precisely what animated its holding in *Edwards*. *See*, *e.g.*, 554 U.S. at 176-77 ("self-representation in [the context of a defendant with diminished capacity] undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial"); *id.* at 176 ("a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel"); *id.* at 175 (recognizing that a mentally competent defendant has the right to represent himself "*provided that* no unusual circumstances exist … that would deprive the defendant of a fair trial if allowed to conduct his own defense") (citing *Cappetta v. State*, 204 So.2d 913, 917-918 (Fla. App. 1967)) (emphasis in original). *See also*, *Frazier-El*, 204 F.3d at 559 ("the government's interest in ensuring the integrity … of the trial at times outweighs the defendant's interest in acting as his own lawyer"); *United States v. Bernard*, 708 F.3d 583, 588 (4th Cir. 2013) (same).

4

These cases all support the same conclusion: that a defendant's right to self-representation must yield to his right to a fair trial.

It is of no moment that Snyder insisted that he was well enough to represent himself and that he was the best man for the job. It is the duty of the trial court, not the defendant, to uphold the right to a fair trial. Thus, it is this concern that must inform the question of whether Snyder should have been permitted to represent himself. He should not have.

The Government attempts to minimize Snyder's demonstrable cognitive difficulties by suggesting that they were somehow feigned. *See*, *e.g.*, Br. of Appellee at 22 (referring to Snyder's "alleged" cognitive issues); *id*. at 23 (referring to Snyder's "allegedly" low level of mental functioning); *id*. at 24 (referring to Snyder's "alleged" cognitive problems). But this disingenuous suggestion is belied by the record in this case. The fact that Snyder was suffering from neurodegenerative disorders that affected his cognitive functioning was well established by his medical records and neuropsychological exam. *See* JA3288-3447. And the exact symptoms described by those records – disordered thinking, disorganization, memory loss, confusion, mental rigidity, getting off topic easily and inability to get back on track (JA3294) – were fully on display both prior to and during the trial.

And while the Government focuses on Snyder's cognitive impairment being classified as "mild," the records reflect that his symptoms were more severe than suggested by this classification. *See* JA3294 ("Despite cognition testing again in "mild" impairment range he is quite disorganized, with poor insight, poor judgment, even w/ difficulty complying with neuro exam and staying on track with history. Confused about meds, appts, medical plans. Repeats himself and gets off topic easily.").

It does not matter that Snyder had moments of clarity during the trial and was able to "score[] a number of … wins." Br. of Appellee at 25. As the *Edwards* Court recognized, mental impairment is fluid and does not always manifest in the same way at all times:

> Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways. … In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel.

*Edwards*, 554 U.S. at 175-76.

To be sure, Snyder was not suffering from mental illness like the defendant in *Edwards*. But as his records clearly establish, his neurodegenerative disorders caused the same symptoms, with the same type of variation, as those supporting the holding of the *Edwards* Court. That Snyder had relatively good moments does

6

not negate the reality: Snyder, due to his Parkinson's, dementia, and other cognitive disorders, "lack[ed] the [] capacity to conduct his defense without the assistance of counsel." *Id*. at 176.

Nor is Snyder required to meet some "exceptional" standard of impairment, as the Government claims. *See* Br. of Appellee at 24. The Government relies on cases from the Ninth and Seventh circuits to suggest that Snyder does not fall into the "narrow class" of defendants contemplated by *Edwards*. Br. of Appellee at 24-25. But, aside from the fact that those cases are not controlling, this proposition does not hold up. First, in the most severe cases, defendants will often be found incompetent to stand trial or to waive their right to counsel. Therefore, the so-called *Edwards* inquiry, *id*. at 24, would not even come into play.

More tellingly, however, this is contradicted by the *Edwards* case itself. Relying on the American Psychiatric Association, the *Edwards* Court adopted the "common sense … conclusion" that "common symptoms of severe mental illness can impair" a defendant's ability to represent himself. 554 U.S. at 176. Those symptoms included "disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, [and] anxiety," *id*., which are

precisely the symptoms that Snyder suffered from (as reflected in his performance at trial and confirmed by his medical records).[1]

In fact, the Government's contention is even contradicted by this Court's own decision in *United States v. Lewis*, in which this Court found that the district court's termination of the defendant's self-representation was justified in light of the defendant's "disordered thinking," which "prevented him from personally managing the large amount of documentary evidence in this case." 612 F. Appx. 172, 176 (4th Cir. 2015). This is no more severe than the difficulties Snyder exhibited during this case. *See* JA660 ("I'm having great difficulty reading through all these documents"); JA701 ("I'm having difficulty with short-term memory. What did I say before?"); JA702 ("I'd rather you rule in my favor now but that's fine. I don't even know what I asked you to rule…"); JA768 ("I don't remember what our last hearing was about").[2]

Snyder's symptoms, regardless of their source or how the Government chooses to characterize them, were at least as severe as those present in *Lewis* and described in *Edwards*; they were severe enough to deprive him of a fair trial; and

---

[1] Snyder's thinking was "quite disorganized," he got off topic easily and had difficulty staying on track (reflecting "deficits in sustaining attention and concentration"); and he was confused and repetitive (reflecting "impaired expressive abilities"). JA3294.

[2] Snyder's opening brief provides numerous, though not exhaustive, examples of how his symptoms manifested both prior to and during the trial. *See* Br. of Appellant at 19-23.

they were severe enough to prompt a denial or revocation of Snyder's self-representation.[3]

The trial court certainly had reason to, and apparently did, second-guess Snyder's ability to represent himself, or at a minimum, the propriety of allowing him to do so. *See* Br. of Appellee at 27. On the very first day of trial, the trial court *twice* warned Snyder that it could and would revoke his *pro se* status if he continued to be disruptive – once in the middle of a cross-examination, and again at the end of the day. JA1035, JA1071. This occurred again on the second day of trial, after the court expressed doubt as to Snyder's ability to follow the rules of evidence and properly examine witnesses. JA1087. This demonstrates that the court felt Snyder's conduct warranted revocation of his self-represented status. Still, while Snyder's symptoms persisted, the court only increased the frequency and severity of its admonishments and sanctions of Snyder, even in the presence of the jury. This response not only hampered Snyder's ability to present his case; it prejudiced him in front of the jury.

Finally, even if – as the Government points out – the court believed that Snyder was acting intentionally (a belief the court implicitly disavowed after having read Snyder's medical records), this does not alter the inquiry nor

---

[3] As discussed at length in Snyder's opening brief, those symptoms were readily apparent prior to Snyder's trial, which is, as the Government acknowledges, what prompted the trial court to refer Snyder for a second *Faretta* hearing.

undermine Snyder's position. A court can deny or terminate a defendant's self-representation anytime his behavior undermines the fairness and integrity of the proceedings – whether due to mental infirmity or intentionally obstructive conduct. *Frazier-El*, 204 F.3d 553; *Faretta*, 422 U.S. at 834 n.46. Here, even if Snyder's conduct had been intentional, it should have become clear to the court that the only way to ensure a fair trial was to revoke his *pro se* status – not to keep chastising him, bickering with him, and ultimately jailing him.

This is not, as the Government suggests, a question of requiring the court to deny or revoke a defendant's right of self-representation any time there is indicia of cognitive disfunction or diminished capacity. Snyder does not seek such a bright line rule. Rather, this is about whether, under the particular circumstances of this case, Snyder could represent himself and still receive a fair trial – a question that a trial court *is* required to consider, at least implicitly, if it is to uphold a defendant's right to a fair trial. The record amply demonstrates that he could not.

The caselaw makes clear that a defendant's right to self-representation must yield to his right to a fair trial, and even to his right to counsel. *See Frazier-El*, 204 F.3d at 559 (when the right to self-representation and the right to counsel are in conflict, "we must ascribe a 'constitutional primacy' to the right to counsel because this right serves both the individual and collective good"). Under the circumstances of this case, permitting Snyder to represent himself despite all the evidence of his

inability to do so without assistance violated both those rights. Reversal is required.

## II. There was a sufficient evidentiary foundation to entitle Snyder to an advice-of-counsel instruction.

Snyder was entitled to an instruction on his advice-of-counsel defense because there was sufficient evidence to "support[] the theory or defense in the instruction." *United States v. Gray*, 47 F.3d 1359, 1369 (4th Cir. 1995). The Government attempts to place a higher evidentiary burden on Snyder, but all that is required is a sufficient evidentiary foundation "to permit the factfinder to pass on the issue." *United States v. Hicks*, 748 F.2d 854, 857 (4th Cir. 1984). That standard was met here.

The Government claims that Snyder was not entitled to the instruction because he could not establish that he disclosed all pertinent facts to his attorneys. Primarily, the Government faults Snyder for not telling his attorneys that he was using extortionate means to secure the consultancy. But this is a guilt-assuming proposition that places upon a defendant the impossible burden of disclosing to his attorneys the Government's version of the facts or its theory of the case. That is not what the law requires. Snyder did not tell his attorney he was committing extortion because that was not his intent. His "threats" to launch a publicity campaign were tied to his legitimate wrongful death claim, and they reflected a common negotiation tactic in a high-stakes malpractice case. Indeed, as Snyder himself

11

explained while meeting with UMMS, every malpractice claim has the potential

for a lawsuit and attendant publicity if the case does not settle, and defendants

settle precisely to avoid these outcomes.[4] JA109.

Thus, even if the jury might ultimately find that Snyder had not told his

attorneys about his alleged "threats" to UMMS (which Snyder does not concede),

this would not defeat his entitlement to the advice-of-counsel instruction. For

purposes of simply *obtaining* the instruction, Snyder was not required to prove the

elements of the defense beyond a reasonable doubt. Nor was he required to rebut

all evidence of guilt. All that was required was that Snyder be able to point to *some*

evidence supporting the elements of his theory of defense.

That standard was met here. First, Snyder's repeated efforts to involve his

attorney, Andrew Graham, in negotiations with UMMS establish strong

circumstantial evidence that he intended for his attorneys to know *everything* about

the proposed deal. Snyder repeatedly urged UMMS's lawyers, Natalie

Magdeburger and Sue Kinter, to speak directly with Graham, even outside of

Snyder's presence. At the June 22, 2018, meeting, Snyder told lawyers for UMMS

that he was working on the proposal with Graham and proposed that they speak

---

[4] Similarly, Snyder's statements that such publicity would harm UMMS's reputation, and by extension, impact their finances, were simply a matter of fact. Warning of a negative press campaign in connection with a legitimate malpractice lawsuit does not convert a settlement demand into extortion.

directly with Graham. *See* JA2856-2857. During a recorded phone call sometime after the meeting, he suggested to Kinter that she, Snyder, Graham, and Magdeburger should all meet. JA275. During another call, Snyder told Kinter that Graham "thinks we should all meet … because he wants you to feel comfortable with the process." JA284. During yet another call, Snyder alerted Kinter that Magdeburger still had not called Graham, and he suggested that Kinter call him as well, so that she could hear from Graham "firsthand." JA295-296. This demonstrates a good faith effort by Snyder to include counsel in the process, even though his efforts were repeatedly resisted by UMMS. Such efforts are inconsistent with an attempt to hide the facts.

Snyder also attempted to bring Graham to one of his in-person meetings with UMMS; but the night before the meeting, at the direction of the U.S. Attorney's Office, Kinter told Snyder not to, and she ultimately canceled the meeting altogether. JA1311, JA050, JA055-056. This, too, shows Snyder's good faith effort to be transparent and include counsel in the process – efforts that were thwarted by the Government. It is patently unfair for the Government to block counsel's participation in these meetings and then complain about a lack of foundation for the advice-of-counsel instruction.

Snyder's attempts both to have UMMS lawyers speak directly with Graham, and to include Graham in his meetings with UMMS, are strong indicia that Snyder

made – or attempted to make – full disclosure to his attorneys. From this, a jury could have reasonably concluded that Snyder was being transparent with Graham. If he were trying to hide any facts from Graham, he would not have wanted UMMS to speak with Graham outside of his presence (where he would have no control over what UMMS might disclose to Graham).

There was also direct evidence – testimony from Graham himself – that Graham knew the critical facts that were central to Snyder's efforts. Graham knew that Snyder was seeking a consultancy in connection with the settlement of a malpractice claim (JA1425, JA1441), and that a fee of $25 million had been discussed. JA1433. Graham advised Snyder on the propriety of the consultancy, as well as the type of work Snyder could perform for UMMS; and he even gave Snyder drafts of two types of agreements that the parties could use to determine the terms of the consultancy. JA1428-1429, JA1430-1431. He knew that the consultancy contemplated Snyder working as a sort of advisor to UMMS, and that this would conflict him out of cases against UMMS; and he advised Snyder that this type of arrangement was permissible.

It would have been impossible for Graham to know more specific terms of any agreement – because no agreement had been reached, and thus, no terms had been decided upon. But Graham knew the critical contours of the agreement. This was a sufficient evidentiary foundation for the jury to pass on the question of

14

whether Snyder had disclosed all relevant facts to his attorney. The question is not whether Snyder could establish that the jury would have answered this question in the affirmative; it is whether there was enough evidence for the jury to *consider* the question. There was.

Lastly, the Government conveniently ignores the evidence reflecting that Snyder's attorneys *did* know that there might be a perception of extortion, and both Andrew Graham and Eric Yaffe had at least some discussion with Snyder about this. This is further circumstantial evidence that Snyder was forthcoming with his attorneys. With Graham, there was an email exchange, JA1426; and with Yaffe, there was a conversation. Yaffe testified that he told Snyder that he was "concerned about the potential for extortion" and that Snyder "responded to what [Yaffe] had suggested to him." JA1336. The content of Snyder's email to Graham and the fact that Yaffe discussed this concern with Snyder were at least sufficient to allow the jury to infer that Snyder had disclosed the pertinent facts to both attorneys.

That there was sufficient evidence to permit a reasonable jury to find in his favor is also supported by the Government's decision, initially, not to prosecute Snyder. When it made that decision, the Government issued a memorandum officially closing its investigation of Snyder and explaining its decision not to prosecute. In this closing memo, the Government explicitly found that Snyder

lacked criminal intent "because [he] was willing to include Andy Graham and members of the UMMS board." JA834. If the Government could find that Snyder lacked criminal intent based on his consultation with and willingness to include counsel (facts that were in evidence at trial), so, too, could a reasonable jury have found in Snyder's favor had they been properly instructed.

The Government next argues that the evidence supporting Snyder's guilt justified the court's denial of the advice-of-counsel instruction. But the question is not whether there is evidence upon which the jury could reject the theory of defense. Indeed, even when there is evidence that the defendant is lying, or even if he advances two contradictory defenses, a defendant is entitled to an instruction on his affirmative defense as long as there is sufficient evidence from which a jury could find in his favor. Again, Snyder was not required to refute all evidence of guilt; all that was required to entitle him to the instruction was that he establish a *prima facie* case for advice of counsel.

For example, in *United States v. Hicks*, 748 F.2d 854 (4th Cir. 1984), this Court found that the district court erred in refusing to give the defendant's alibi instruction, even though the only evidence of his purported alibi came in the form of his post-arrest statement to police, the statement was contradicted by other evidence in the case, and there was sufficient evidence from which the jury could find that the defendant's post-arrest statement "was untruthful, that he had no alibi,

16

and that he was guilty as charged." 748 F.2d at 858-59. Ultimately, it was the province of the jury to weigh the credibility of the defendant's statement, the testimony of other witnesses, and the remaining evidence in the case. But the defendant's pretrial statement to police was enough, by itself, to entitle him to the instruction. *Id. See also*, *Matthews v. United States*, 485 U.S. 58 (1988) (holding that defendant was entitled to instruction on affirmative defense of entrapment, even though he, through his own testimony, denied having committed the crime, and even though outright denial of the offense was inconsistent with an affirmative defense that the defendant was entrapped).

   The Government acknowledges that Snyder's lawyers knew at least some information related to Snyder's pursuits, but argues that what they knew was simply not enough to establish Snyder's defense. But that was for the jury to decide, and Snyder met the necessary threshold of establishing an evidentiary foundation to support the defense. Ultimately, as the instruction reads, it was for the jury, not the trial judge, to determine whether Snyder "made a full and complete report to his lawyer," whether he "acted in good faith for the purpose of seeking guidance as to the specific acts in this case," and "whether he acted substantially in accordance with the advice received." Modern Federal Jury Instructions—Criminal, ¶ 8.04.

The trial court's refusal to give the requested instruction was not harmless error. The Government relies on *United States v. Cousar*, 539 F. Appx. 83 (4th Cir. 2013), for the proposition that the trial court's refusal to give an instruction did not impede the defendant's ability to argue his theory of defense to the jury and thus did not constitute an abuse of discretion. But *Cousar* is not at all comparable. In that case, the defendant – charged with conspiracy to distribute cocaine base – requested an instruction that he could not be convicted of conspiring only with a government agent. *Id*. at 85. But in closing, his defense was *not* that he had conspired only with a government agent and thus could not be found guilty; rather, he argued that his alleged co-conspirators were lying, and he denied any involvement in the conspiracy. *Id*. at 86. It makes sense, then, that this Court found his defense was not affected by the court's refusal to give the requested instruction, because the requested defense was not the one he pursued. Here, on the other hand, Snyder was deprived of an instruction on the very defense he pursued – his entire and only defense. This gravely impeded his ability to establish that defense.

The Government also states the wrong applicable standard here, arguing that any error was harmless because the outcome of the case was not "substantially swayed" by the absence of the advice-of-counsel instruction. Br. of Appellee at 37. But this Court has explained that, if there is sufficient evidence "to permit the factfinder to pass on the issue," a defendant has "a Sixth Amendment and due

process right to have that issue submitted to a jury." *Hicks*, 748 F.2d at 857. The

Court elaborated:

> If the trial judge evaluates or screens the evidence
> supporting a proposed defense, and upon such evaluation
> declines to charge on that defense, he dilutes the
> defendant's jury trial by removing the issue from the jury's
> consideration. In effect, the trial judge directs a verdict on
> that issue against the defendant. This is impermissible.

*Id*. at 857-58. This is precisely what the trial court did here. And because

constitutional rights are implicated, Snyder's conviction can be sustained only if

this Court finds that the error was "harmless beyond a reasonable doubt." *Id*. at

858.

      The failure in this case to instruct the jury on the advice-of-counsel defense

was not harmless beyond a reasonable doubt. If the jury had received the

instruction and found that Snyder established the elements of that defense, it would

have been required, as a matter of law, to find him not guilty. But the jury did not

know this. Although Snyder argued this defense in his closing, the jury was not

informed of the elements of the defense; it did not know what it had to find in

order to determine whether the defense was applicable; it did not know what

evidence to look to in support of the defense; and most importantly, it did not

know that the defense, if established, entitled Snyder to a verdict of not guilty.

      In addition, closing argument is just that – argument. Juries are routinely

instructed, as they were in this case, that statements and arguments of counsel are

not evidence. *See* JA2436. They are instructed that they must apply the facts to the law as explained to them *by the court*. Here, the law on the "advice of counsel" defense was never explained to the jury by the court. It does not matter that Snyder made his argument; there was no law for the jury to apply the facts to.

The court's error in this case was not harmless beyond a reasonable doubt, and it mandates reversal.

## III.    The trial court's limitation of Michele Sanders's testimony violated Snyder's constitutional rights.

The trial court's limitation of Michele Sanders' testimony constitutes reversible error because any "legitimate interest" that the Government had in enforcing the confidentiality provision of its settlement with Sanders was – and remains – secondary to Snyder's constitutional rights to due process and compulsory process under the Fifth and Sixth Amendments. While it is true that trial courts may consider "other legitimate interests" in imposing limitations on a defendant's presentation of evidence (Br. of Appellee at 39), a court may not apply such restrictions "mechanistically to defeat the ends of justice, but must meet the fundamental standards of due process." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987). Further, the interests served by the restrictions must justify the violation of a defendant's constitutional rights. *Id*. at 56.

The trial court's limitations in this case did not "meet the fundamental standards of due process" because the court mechanistically excluded almost any

topic covered by the non-disclosure provision ("NDA") of Sanders's settlement agreement. It is true that, in some instances, the court also questioned the relevance of a particular question; but it is clear from the record that the court was giving primacy to the NDA – not to other evidentiary issues, and not to Snyder's constitutional rights.

The court restricted Sanders's testimony any time that either she or her attorney mentioned the agreement. *See*, *e.g.*, JA2145 (Sanders says, "I can't talk about that," and court, without inquiry, states, "Okay. Then let's move on."); JA2145-2146 (Sanders says, "I can't talk about that" and "I'm not permitted to answer that question," and court directs Snyder to continue his examination and the parties can take a sidebar later); JA2148 (after Sanders's attorney says that "anything having to do with the substance leading to the cases I think is forbidden by that agreement," the court instructs Snyder to "cut right to it" – meaning, ask Sanders about the consultancy, but not about her settlement)[5]; JA2173 (Snyder asks Sanders about his initial demand to UMMS in her case, and after Government objects, court responds, "So I'm going to sustain, I've got her lawyer standing up in the back"); JA2176-2178 (when Snyder attempts to elicit information about Sanders's meeting with one of UMMS's transplant doctors, Sanders's lawyer states

---

[5] Indeed, Snyder complained at this juncture that the court "told [him] how to ask the question." JA2149.

21

that such testimony is "a clear violation of the NDA," and the court agrees,

excluding such testimony); JA2185-2186 (Snyder asks Sanders about the changes

UMMS made as a result of her malpractice claim, and the court precluded the

testimony because it was prohibited by the NDA); JA2187 (Snyder asks Sanders

why she included a demand about the terminated doctors not being hired back by

UMMS, and the court again precluded the testimony on the ground that it was

prohibited by the NDA).

These exchanges demonstrate, without question, that the court's basis for

excluding the testimony was the non-disclosure provision of the settlement

agreement – and *not* other evidentiary concerns, as the Government alleges.

Nor did the interests served by the court's restrictions justify the resulting

violation of Snyder's constitutional rights. The Government cites an unreported,

Sixth Circuit case as support for its assertion that UMMS's and Sanders's

"legitimate interest" in enforcing their agreement warranted the restrictions on

Sanders's testimony. Br. of Appellee at 40. But that case involved a rape-shield

law which prohibited cross-examination about the sexual history of a victim of

sexual abuse. *Batey v. Haas*, 573 F. Appx. 590, 593 (6th Cir. 2014). The Sixth

Circuit agreed that the heightened protection afforded to victims of sexual abuse

regarding their sexual history was a legitimate reason to restrict the defendant's

cross-examination of the victim in that case. *Id*. No such interest is present in the instant case.

The other out-of-circuit case upon which the Government relies – *Baker v. Goldman-Sachs & Co.*, 669 F.3d 105 (2nd Cir. 2012) – is a civil case that did not implicate a criminal defendant's right to compulsory process or due process, and thus provides no cover for the Government or the court.

At bottom, the so-called "legitimate interest" that was at stake for UMMS in this case was its interest in keeping the details of its malpractice quiet. Such an interest, while legitimate in the contractual sense, cannot trump a defendant's right to present relevant testimony and fully present his defense. Indeed, the Government cites no case in which such an interest is given primacy over a criminal defendant's constitutional rights (because there is none). And this is particularly true in this case, where the fact of the wrongful death claim, and UMMS's settlement of it, had already been made public by the trial. There was no legitimate reason, under those circumstances, for the trial court to prioritize UMMS's confidentiality interest over Snyder's constitutional rights.

The Government incorrectly argues that the questions Sanders was prohibited from answering were irrelevant or immaterial. However, Snyder was attempting to elicit (1) that the consultancy was Sanders's idea (a point which the Government simultaneously argues was both already established, and not

established at all, *see* Br. of Appellee at 45); (2) details about UMMS's negligence in her husband's case; (3) admissions made by UMMS during the settlement; and (4) the remedial measures taken by UMMS as a result of Sanders's case. These issues were relevant both to Snyder's state of mind during his settlement negotiations (including his intended objectives with respect to any settlement and the consultancy), and to the basis for his warnings of bad publicity and financial ruin (which form, in part, the basis for the Government's claim of extortion). The remedial measures taken by the hospital, including changing its informed consent process, terminating doctors, and removing promotional videos from its website, were also important because they contradicted the hospital's claims that it had done nothing wrong, and they gave credence to Snyder's allegations of systemic fraud and negligence at the hospital (which again, formed one of the bases for his alleged "threats" against the hospital). From this perspective, Snyder's demands make more sense. It was important for the jury to hear this directly from the mouth of the person who was a victim of that fraud and negligence, and who was the driving force behind Snyder's settlement demands.

Exclusion of this information harmed Snyder's defense because it prevented the jury from hearing critical evidence that would have given it insight into Snyder's state of mind at the time of his negotiations with UMMS. This was important because the jury had to determine whether Snyder had any criminal

intent; and as the jury was instructed, intent is a state of mind for which there is rarely any direct evidence, and which instead must be established by the surrounding facts and circumstances. JA2412-2413. Sanders's excluded testimony was relevant to those "surrounding facts and circumstances."

As argued in Snyder's opening brief, the trial court's error was compounded by the fact that Sanders's attorney was permitted, on numerous occasions, to object or speak out from the gallery, even though he was not a party to the case. *See* JA2173, JA2176, JA2185, JA2187. When Snyder complained about this, or attempted to challenge the attorney's objections, the court admonished Snyder, making it seem as though *he* had done something wrong. This was particularly prejudicial because it made Snyder appear argumentative with and even adversarial to his own witness.

The limitations on Sanders' testimony in favor of the non-disclosure provision of her settlement agreement with UMMS were unjustified, violated Snyder's constitutional rights, and defeated the ends of justice. Reversal is required.

## **CONCLUSION**

For all of the foregoing reasons, Appellant Stephen Snyder respectfully requests that this Honorable Court reverse the judgment of the district court and vacate his convictions.

Respectfully submitted on January 28, 2026.

/s/ C. Justin Brown
C. Justin Brown, Esq.
Lylian Romero, Esq.
BROWN LAW
233 E. Redwood Street, Suite 1000C
Baltimore, MD 21202
Phone: (410) 244-5444
Fax: (410) 934-3208
brown@cjbrownlaw.com
romero@cjbrownlaw.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This Reply brief of the Appellant has been prepared using Microsoft Word software, Times New Roman font, 14-point proportional-type size.

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of authorities; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains 6,024 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____

C. Justin Brown

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of January 2026, a copy of the foregoing Opening Brief was served via ECF on M.J. Kirsch Muñoz, Assistant United States Attorney.

_____/s/_____
C. Justin Brown

28