**UNITED STATES COURT OF APPEALS**

RECEIVED

2026 JUL 28  A 11: 18

U.S. COURT OF APPEALS
FOURTH CIRCUIT

**FOR THE FOURTH CIRCUIT**

**No. 25-4218**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STEPHEN L. SNYDER,

Defendant-Appellant.

**PETITION FOR PANEL REHEARING AND REHEARING EN BANC**

Appeal from the United States District Court for the District of Maryland, at

Baltimore

Deborah L. Boardman, District Judge

(1:20-cr-00337-DLB-1)

## <u>PETITION FOR PANEL REHEARING AND REHEARING EN BANC</u>

Pursuant to Federal Rule of Appellate Procedure 40 and Fourth Circuit Local Rule 40, ("Snyder") respectfully petitions for panel rehearing and rehearing en banc as a pro se citizen and not a lawyer, as his license is currently under suspension. Rehearing is warranted because the panel overlooked and misconstrued material matters of law and facts central to Snyder's intent and his ability to present a complete defense.

The district court docket includes Snyder's Motions to Dismiss (ECF Nos. 52, 53), Motion to Compel Brady material (ECF No. 69), Brady hearing (ECF No. 88), his motion in limine (ECF No. 220), the Government's motions in limine (ECF Nos. 224, 243, 257, 268), and motions hearings on October 28 and November 4, 2024 (ECF Nos. 237, 262). The October 28, 2024 transcript is at ECF No. 338. (See ECF Nos. 52, 53, 69, 88, 220, 224, 237, 243, 257, 262, 268, 329–338, 366.)

This seriously flawed decision needs a review by the entire bench. This petition brief focuses on rehearing en banc standard 4. The case presents a question of exceptional importance concerning the line between wrongful extortion and threatened legitimate litigation *(Fed. R. App. P. 40(b)(2)(D).*

The Graham evidence bore on advice of counsel and intent. The closing memorandum and prior investigation bore on the contemporaneous evidence

1

concerning intent. The grievance bore on the ethical framework in which the consultancy was being discussed. Sander's testimony bore on the underlying representation and Snyder's claimed factual basis for pursuing litigation. Kinter's cross-examination bore on (UMMS) intentions and the Government's involvement.

It is disheartening that the Government would instruct and (UMMS) would agree to have its counsel speak to Snyder's counsel and record the conversation without the ethic's counsel's knowledge. *(Md. Code Ann., CT's. & Jud. Proc. § 10-402 (requiring the consent of all parties before recording a private oral communication).*

The district court restricted each of these avenues. The cumulative result was that Snyder could not connect the evidence into the coherent defense he sought to present. The panel then relied, in part, on the absence of evidence concerning Graham's knowledge. That sequence presents a question of exceptional importance under Rule 40: whether cumulative evidentiary restrictions violate the right to present a complete defense when they prevent a defendant from establishing the very factual foundation later found missing on appeal. *(Fed. R. App. P. 40(b)(2)(D).*

Snyder has not filed a claim against (UMMS) for all of its torts mostly intentional. Snyder wanted (UMMS) to pay for its misconduct, but had no desire to destroy (UMMS). (UMMS) knew by its purchase of Saint Joseph Hospital at a fire

sale knew how significant bad press and egregious misconduct can have upon the economics and the number of patients at that hospital as well as its value.

At sentencing, the district court's treatment of Snyder had materially changed. The court imposed no incarceration and instead imposed three years of probation notwithstanding the Government's request for 3 years' incarceration and a $100,000.00 fine. Snyder's probation was terminated after approximately 11 months despite the Government's objection.

The disparity between the panel's comments during oral argument and its subsequent written opinion marks the first indication that SOMETHING IS FUNDAMENTALLY WRONG WITH THIS DECISION. During oral argument, the panel repeatedly acknowledged Snyders competence and described his trial performance as "pretty good" and "pretty decent." Over the last 20 years, all of Snyders CASES SETTLED without a lawsuit nor discovery with the (UMMS) for approximately $100 million. This confirms that (UMMS), prior to this case had the utmost respect for Snyder and never ever questioned his integrity. During oral argument, Judge Wynn acknowledged the extraordinary nature of the case stating it's a highly unusual case. Judge Wilkinson observed, "He actually, from all I can gather, did a pretty decent job of representing himself." Judge Wynn agreed, stating, "He did a pretty good job. You look at the cross-examination, you look at the closing argument, it's pretty good." (*Oral Arg. Tr.*)

3

Judge Wynn said "This gentleman is an attorney not your usual pro se litigant." Judge Wilkinson commented, there are so many other pro se defendants that would not do near the job Snyder did here."

Judge Wynn concluded in the written opinion that Snyder's performance "fell far short of what we would expect from a competent member of the criminal defense bar." *(United States v. Snyder, No. 25-4218, slip op. at 14 (4th Cir. 2026).*

While the opinion reflects one meeting involving Dr. Bartlett in fact there were three meetings. The evidence reflected three meetings between Snyder and Dr. Bartlett: February 15, March 21, and March 31, including two meetings at the Capital Grille and one at Bartlett's country club. The Appellate opinion refers to one meeting only. It is obvious that this decision reflects no knowledge of what took place on February 15th and March 31st.

This unexplained shift underscores the need for rehearing because the written opinion does not reflect the Court's own discussion of the record at oral argument.

Snyder's insistence that any arrangement had to be ethical, moral, proper, and lawful. If it could not lawfully be done, he would not do it. Rehearing is warranted to determine whether the Appellate court's conclusion that the evidentiary foundation was absent cannot stand without confronting Snyder's contention that the

4

district court's own rulings materially prevented him from establishing that foundation.

Snyder was prepared on all motions, opening statement, cross-examination and closing argument as he is on all of his cases which he wins because of said preparation and the fact that as a self-made man, juries loved him. *(He Keeps on Proving Juries Just Love Him; Lawyer: The Baltimore Sun (Apr. 29, 1999), at 2.)* Snyder for over 50 years has treasured his law license and had through hard work had a stellar reputation of success and a stellar reputation for philanthropy. Many of the charitable contributions impacted our law profession. Snyder was a member of the board of Legal Aid. In one-year Snyder matched the entire state contributions by lawyers for two charities that the Legal Aid bureau had chosen to support. 1: was for hunger for intercity students and 2: helping inner city children get accepted into college. Snyder was a terrific advocate both in trial and in negotiations. In the last 10 years leading up to this grievance in 2018, all of Snyder's cases settled without a lawsuit without discovery for multimillion dollar amounts and the defendant's received confidentiality.

## I: DUE PROCESS

If this decision is allowed to stand this would be a disgrace when in reality, there is not remotely close to a clear understanding of the facts and the violations of due process thrust upon Snyder.

The first question asked in the appellate brief referenced due process violations separated apart by the word 'AND' and the issue of pro-se revocation of Snyder's ability to argue the case consumed the first 21 minutes.

Susan Kinter, Vice President and Risk Manager of (UMMS) stated this case is huge, the biggest case I've ever had and acknowledged in the transcript that exposure by the filing of this lawsuit that meant (UMMS) was facing a CATASTROPHE *(Recorded Telephone Call between Kinter and Snyder, Aug. 20, 2018, at 16–17.)* (UMMS) had the motive and intent to freeze Snyder and used the rules of PROFESSIONAL CONDUCT AS A SWORD. Kinter acknowledged in surveillance that (UMMS) was at a bad situation and said have Andrew Graham print the consulting agreement as he sees fit.

Snyder's position is that he was never threatening to shut down (UMMS). He was stating that, if no lawful agreement could be reached, he would pursue legitimate litigation concerning conduct he believed actionable and that litigation could naturally produce serious economic and public consequences. Even threatened

6

meritless litigation is not wrongful under Maryland extortion law. *(State v. Rendleman, 402 Md. 37, 935 A.2d 406 (2008).*

The district court did not permit Michele Sanders, Snyder's client and a central witness to the underlying events, to be fully questioned concerning the settlement because of the nondisclosure agreement. Snyder contends that the court improperly prioritized the private nondisclosure agreement over his constitutional right to present a complete defense. *(See Davis v. Alaska, 415 U.S. 308, 319–20 (1974) (confidentiality cannot override confrontation rights).*

The Appellate court itself recites BARLETT'S STATEMENT THAT "SUE AND I JUST SPOKE." I explained that we are in jeopardy for fraud and punitive damages. She understands. The ball is in your court. *(Bartlett Text Message (Apr. 10, 2018).* Bartlett and Snyder met three separate times – not one as suggested by the Government or the Appellate Court decision.

Snyder contends that, as early as the motions in limine, the district court had concluded that he was dishonest, intentionally manipulative, and unwilling to follow instructions. According to Snyder, those conclusions preceded and affected rulings determining what evidence he could present. The mindset of the Judge is prejudicial in reviewing abuse of discretion issues.

Rehearing is warranted because the panel's characterization resolves a disputed issue—whether the threatened conduct was wrongful—by adopting the Government's characterization without fully addressing Snyder's competing theory. That distinction bears directly on intent and on the panel's own discussion of the wrongful use of fear. *(Snyder, slip op. at 21–22.)*

## II. FINAL CLOSING MEMO

Wise had been questioned at Brady what is the protocol for securing an indictment. Wise identified the different levels of review. Two years later, an unscrupulous assistant US attorney, Leo Wise on one day's notice without witnesses, had the grand jury indict Snyder on the exact same set of facts. Robert Hur was the U.S Attorney both in 2018 and in 2020. The U.S. attorney's office issued a memo to its assistant U.S. attorneys to target high profile trial lawyers who use extortion as a method to settle cases instead of appropriate advocacy.

The district court would not allow Snyder to call Leo Wise who had been subpoenaed to testify. Leo Wise categorically lied to the district judge during the Brady Hearing pursuant to a specific question about the existence of a final closing memo. His response was we have no exculpatory material, yet in fact there was a final closing memo given to the court on the eve before the closing argument. Snyder was required to view the document in the U.S Attorney's office through a glassed

mirror where he took a picture of the document. "These kinds of cases are vetted really at the highest levels and I don't think I am giving anything away, they also go before committees, indictment review committees and you hash it out. What are the defenses? What are the weak points? And you have the kind of open – and this is what we want right. This is what the public wants, that we're not going off half - cocked, that we kick the tires and find out where the blind spots or the weak spots, whatever metaphor you want to use." (***Brady citation Brady Hr'g Tr. 97:12–25.***) He clearly violated his own identified protocol which supported an indictment requires different levels of review. All parties believed the case was over. If an assistant U.S Attorney has a different opinion and wants to indict, they must identify any factual changes.

A final closing memo acknowledged after a complete review of all the evidence that Snyder did not commit a crime based on advice of counsel and no criminal intent. The Judge read the closing memo into the record outside the presence of the jury and it was called the FINAL CLOSING MEMO. *(Closing Memorandum Internal Document EX 1.)* The closing memo is completely different from the version where the Federal district Judge gutted the entire case and the Jury and the Appellate court heard a completely different distinguishable version of the facts. The trial Judge would not allow the final closing memo into evidence. This final closing memo had multiple supporting documentation which the U.S

Attorney's office threw in the trash and ridiculously claimed that it needed storage space in the closet. The Government was unable to reproduce the supporting documentation all of which clearly supported its decision and it's reasoning not to prosecute.

The closing memo was titled FINAL CLOSING MEMO and was requested in a specific question at the Brady hearing in 2022. (UMMS) was exposed to potential serious economic harm and the greater the egregiousness of the misconduct, the greater the potential economic harm. This is clearly not black mail; it is advocacy at its best and produced a $5 million settlement unimportant to the plaintiff and 4.150 million dollars above the $850,000 cap on wrongful death in Maryland at that time. Avenatti argues that "[c]ourts have largely exempted [litigation-related] threats from the extortion statutes as a matter of law because, by its very nature, litigation is inherently threatening and poses a risk of economic loss to all parties." (Def. Br. (Dkt. No. 35) at 13) But the unusual feature of this case is that the Government alleges that Avenatti – using his client's confidential information – demanded millions of dollars for himself, without his client's knowledge, and to his client's detriment. (S1) Indictment (Dkt. No. 72) at ¶¶ 11(c), 13(a), 14(a), 14(b), 14(d) These factual allegations take this case outside the usual parameters of civil litigation, constitute "wrongful" conduct, and raise the specter of extortion. 2 Indeed, the Indictment alleges millions of dollars Avenatti sought for

10

himself were completely divorced from his client's claim. *(United States v. Avenatti, No. 19 Cr. 373 (PGG), slip op. at 16 nn.1–2 (S.D.N.Y. Jan. 6, 2020).*

### III. 2018 GRIEVANCE

The trial Judge would not allow the grievance filed by (UMMS) into evidence which indicated (UMMS) had NO INTENTION from DAY ONE TO ENTER INTO A CONSULTANCY WITH SNYDER, yet pursuant to Government instructions, (UMMS) led Snyder to believe that this consultancy was go. The documentary record establishes that ethics counsel Graham was involved in the proposed consulting arrangement from its inception. Two high ranking officials involved in the case noted that Snyder had never brought up the consultancy prior to the June meeting. *(Grievance, Oct. 22, 2018, Ex. 70, ECF No. 52, at 530.)*

The grievance noted that (UMMS) charged Snyder with attempted extortion with no CHARGING POWER aware that the Government and the discipline commission had closed its file determining there was no crime committed.

Pursuant to Government instructions to Kinter, she lied continuously to Snyder following the June meeting that (UMMS) wanted to enter into a consultancy with Snyder as noted in the trial transcripts. Kinter believed it was ok to lie if the Government told her to do so.

11

The grievance addressed Rule 5.6(b), (UMMS) position concerning the proposed consultancy, and the absence of controlling authority directly resolving the precise professional-responsibility issue presented. *(Rule 5.6(b) and UMMS's position on the proposed consultancy. (ECF Nos. 52, 55, 79, 220.)* Rehearing is warranted because the grievance and related ethical framework were part of the factual context through which Snyder sought to explain his intent were ruled inadmissible by the Judge.

## IV. ADVICE OF COUNSEL

Snyder had never in his career performed a consultancy for an adversary and therefore sought an ethics attorney, Andrew Graham. The district court refused to allow evidence of any kind related to letters from Arnold Weiner, Esq. and ethics attorney Andrew Graham, Esq. which were written to Lydia Lawless, that this was not a crime. These letters referenced above obviously influenced Lydia Lawless to not charge Snyder with attempted extortion. *(See Weiner and Graham Sept. 5, 2018 Ltr.)* The Court should also review the comprehensive submissions prepared individually by Graham and a separate letter by Graham and Weiner explaining why the operative facts of this case do not constitute extortion. Those contemporaneous legal analyses examine the governing law, the factual record, and the proposed consulting arrangement, concluding that Snyder's conduct constituted lawful advocacy rather than extortion. Fourth Circuit opinion rests upon the premise that

12

Snyder engaged in extortionate conduct, these submissions directly address one of the central issues before the Court and should be considered by the Court sitting en banc. *(Graham, Response to Statement of Charges (Feb. 28, 2020), at 1–39; June 7, 2019 Letter from Weiner and Graham to Lydia Lawless.)*

The district court would not allow evidence into the record that a scheduled meeting with Snyder and Graham and (UMMS) for September 6th was canceled by Government to (UMMS) because they DID NOT WANT SNYDER'S ETHICS ATTORNEY GRAHAM RECORDED. The September meeting bore on Snyder's willingness to involve counsel openly and would have resolved whether or not the parties would enter into a consultancy.

Before and during the negotiations with the (UMMS), Snyder retained Graham to provide ethics advice concerning the proposed consultancy. Snyder repeatedly directed (UMMS) to communicate with Graham regarding the proposed agreement, and on August 30, 2018, Graham transmitted a draft Legal Consulting Agreement, describing it as a "first draft" and expressing his hope that the parties would ultimately reach the agreement they desired. Graham later confirmed in the Bar Counsel proceedings that he had been retained in connection with the proposed consultancy and that Mr. Snyder had sought legal and ethical advice before proceeding. These contemporaneous documents demonstrate that Graham's involvement was continuous throughout the negotiations and corroborate Snyder's

13

position that he was attempting to structure a lawful and ethically compliant consulting relationship. *(Draft Legal Consulting Agreement (Aug. 30, 2018), ECF No. 182-7; Graham's Response to Statement of Charges (Feb. 28, 2020); Letter from Weiner to Lawless (June 7, 2019).*The Appellate Court itself acknowledges that Snyder told (UMMS) representatives that he retained Graham "to make sure the consultant agreement was ethical" and asked that counsel meet with Graham "to figure it out ethically, morally, comfortably, to see if there's a solution how to do it." *United States v. Snyder, No. 25-4218, slip op. at 5 (4th Cir. July 14, 2026).* The Appellate court itself acknowledges that Snyder retained Graham "to make sure the consultant agreement was ethical," and asked (UMMS), to meet with Graham, and that counsel eventually spoke with Graham. Graham told Madenburger all the good things that Synder can do for (UMMS). *United States v. Snyder, No. 25-4218, at slip op. 5–6 (4th Cir. 2026).* Snyder's position is that he affirmatively sought to bring Graham into the contemplated meeting because the proposal was to proceed only if it could lawfully and ethically be structured. The opinion states that Snyder was threatening to shut down (UMMS), get Kinter personally fired, ruin Dr. Bartlett's career, and run an aggressive media campaign against (UMMS) if it did not agree to personally pay him $25 million." *(Snyder, slip op. at 17.)*

Rehearing is warranted because the panel rejected the reliance-on-counsel instruction on the ground that there was insufficient evidence that Graham knew the

14

"heart of the extortion allegations," while Snyder contends that the district court excluded evidence concerning the very meeting that would have placed Graham directly into the continuing discussions. ***United States v. Snyder, No. 25-4218, slip op. at 5–6 (4th Cir. July 14, 2026).***

The central problem is that below is that the panel's decision rests on the absence of evidence concerning Snyder's intent and Graham's knowledge while the district court excluded or materially restricted interconnected evidence that would have supplied that context.

The excluded and restricted record showed Graham's involvement while the proposed consultancy was still being developed, Snyder's repeated efforts to place Graham directly into the negotiations, and Snyder's insistence that any arrangement had to be ethical, moral, proper, and lawful.

The closing final memo incorporated the entire evidence which is materially different from the gutted version that went before the jury and considered by the Appellate court.

Why would an experienced lawyer affirmatively seek to bring his own lawyer to a meeting at (UMMS) which he supposedly intended to commit extortion? Snyder contends that a meeting with Graham present would instead have documented that

15

(UMMS) could accept a lawful consultancy or reject it and if rejected Snyder could pursue lawful litigation.

Rehearing is warranted to determine whether the Appellate courts conclusion that the evidentiary foundation was absent cannot stand without confronting Snyder's contention that the district court's own rulings materially prevented him from establishing that foundation.

## V. MICHELE SANDERS

Michele Sanders had no interest in money. Sanders wanted to prevent what happened to her husband from happening to another citizen. Snyder, a contingency lawyer, takes a percentage of any recovery either by settlement or by trial. Snyder agreed that he would follow the mandate of his client Michele Sanders and work toward a consultancy agreement. Snyder additionally retained ethics experts Eric Yaffe and his associate John McNutt whom he paid $50,000 for a memo of Law of how we could proceed. This memo of law was used by Snyder at the June 23rd first consultancy discussion.

The consultancy discussions were in the embryo stage. These discussions surfaced on June 22 for the first time. *(Graham Resp. 5; Boardman Tr. 43–44.)*

Leo Wise responding to Kinter's admission that the Government canceled the meeting because it was being recorded stated that Snyder committed this crime over

16

8 months and therefore would have needed a time machine for this meeting to have importance. This was a lie and the indictment noted meetings most of which had nothing to do with Graham and the first date noted, Michele Sanders had not retained Snyder.

The panel characterized the alleged threats as the "heart of the extortion allegations." Snyder's defense was materially different: he maintained that he was attempting to pursue legitimate litigation concerning conduct he believed actionable if no lawful consultancy was reached. Because wrongfulness and intent were central to the charged offense, Snyder contends that the jury was entitled to hear the complete evidence supporting that distinction. The discipline commission and the U.S. Government accumulated 88 exhibits, multiple texts and emails, a seven-hour deposition of Snyder, sixteen separate surveillance recorded conversations of Snyder without his knowledge took place.

Rehearing is warranted because Snyder contends that the unavailable or excluded materials would have shown why earlier investigators concluded prosecution was unwarranted and would have supplied evidence concerning counsel, intent, and the contemplated Board presentation.

## VI. LEGITIMATE OR SHAM CONSULTANCY

The Statement of Charges itself, particularly paragraphs 113 through 116, together with Alicia's contemporaneous comments concerning the services Snyder could perform for (UMMS), demonstrate that the proposed consultancy contemplated actual work, not payment for doing nothing. The Statement of Charges acknowledges that Snyder proposed providing (UMMS) with the perspective of an experienced plaintiffs' lawyer advising the (UMMS) concerning informed consent, settlement of future cases, marketing and public relations. *(ECF No. 182-7; Graham Resp. 5, 9; Snyder, slip op. at 5–6.)* This evidence directly rebuts the Government's theory that the consultancy was a sham and supports Snyder's position that he sought to structure a lawful, ethical consulting arrangement rather than receive payment for doing nothing. It likewise contradicts the premise that Snyder sought $25 million in exchange for a "free ride." (UMMS) acknowledged in the grievance that Snyder believed he was complaint with Rule 5.6 (b) and stated there were no Fourth circuit case available on this issue.

## CONCLUSION

Stephen Snyder respectfully requests that the Court grant panel rehearing and/or rehearing enbanc, and vacate the judgment and opinion as appropriate.

18

## CERTIFICATE OF COMPLIANCE

This petition contains 3,880 words and complies with Federal Rule of Appellate Procedure 40(d)(3).

/s/ Stephen Snyder
Stephen Snyder, Pro Se

19

EXHIBIT 1